## WORTHINGTON *v.* BOSTON.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 312. Argued March 20, 21, 1894. — Decided April 9, 1894.

The Mayor and City Council of Boston had authority, in 1885, to authorize the City Water Board, without previous advertisement, to contract for the exchange of such pumping engines and machinery as were inadequate or of insufficient capacity for those of the capacity required by plans and estimates for a high-service extension previously made, and to direct that the expense of such exchange should be charged to the appropriation for high-service extension; and the contract made by the Water Board, in pursuance of such authority, and without previous advertising, is binding on the city.

THE plaintiffs in error, as surviving partners of a firm doing business under the name of Henry R. Worthington, brought this action upon a written agreement concluded, May 19, 1885, between that firm and the Boston Water Board — the latter assuming to act on behalf of the city of Boston.

This agreement involved the expenditure of a large sum of money for pumping engines and machinery in connection with the "high-service" extension of the water works of the city, and was made without an advertisement for proposals by bidders.

The court below tried the case without a jury pursuant to a written stipulation of the parties, and, being of opinion that without such advertisement the Water Board had no authority to make the agreement, gave judgment in favor of the city. 41 Fed. Rep. 23. Whether the Water Board had such authority depends upon certain facts set forth in an agreed statement of the parties. These facts are as follows:

The city of Boston previous to, and ever since, the year 1875 was authorized to take water from Lake Cochituate, Sudbury River, and Mystic Lake, to build and maintain aqueducts, dams, reservoirs, and to lay pipes, establish hydrants, and supply its inhabitants with water in such manner and by such agents, officers, and servants as the city council should from time to time direct; and previous to 1875 it had established the Cochituate Water Board and the Mystic Water Board to exercise those powers, subject to the ordinances and orders of the city.

By chapter 80 of the statutes of Massachusetts of 1875, it was provided : "The city council of the city of Boston may establish by ordinance a water board to be known as the Boston Water Board, consisting of three able and discreet persons to be appointed by the mayor, with the advice and consent of the city council, and to receive such compensation as the city council may from time to time determine. The said board may be empowered by said city council to exercise all or any of the powers conferred by the statutes of the Commonwealth upon the city of Boston, with reference to supplying said city with water, or of the Cochituate and Mystic Water Boards, and also to act as the agent of the city of Boston in doing any and all things which the city is now authorized to do in relation to the taking of lands, water rights, and other property, and the establishment and maintenance of works and appliances for supplying the city of Boston or other cities and towns with pure water, and the said Boston Water Board shall, so far as the city council of said city may by ordinance prescribe, succeed to all the powers and duties formerly vested in the Cochituate Water Board and Mystic Water Board."

On the 22d day of March, 1876, the city council of Boston, with the approval .of the mayor, passed an ordinance that was in force when the agreement in question was made, and which, among other things, provided : " There shall be a board to be known as the Boston Water Board and to consist of three members. Said board shall have and exercise all the powers so far as such powers can be legally delegated by the city council, which were granted to the city by or are held by the city under chapter one hundred and sixty-seven of the statutes of the Commonwealth of the year eighteen hundred and forty-six, chapter one hundred and seventy-seven of the said statutes of the year eighteen hundred and seventy-two, and by or under any and all statutes in addition to either of the before-mentioned chapters, subject, however, to the authority of the city council from time to time, by ordinances, orders, or resolutions, to instruct said board, and to change and limit their powers. Said board may, subject to the approval of the mayor, sell or lease such of the property connected with the water works as they deem expedient, and all necessary deeds and leases shall be executed by the mayor and countersigned by the chairman of said board. No contract or purchase which is estimated to involve an expenditure of more than ten thousand dollars, except a contract for the laying of pipe, shall be made by the said board until they have advertised, as hereinafter provided, for sealed proposals thereof.   .   .   .   All proposals shall be publicly opened at the time and place designated in the advertisement, and the said board may reject any or all bids which are offered, and it shall be their duty to reject the bids of all irresponsible parties."

For several years prior to 1884 the question of extending the high-service works of the Cochituate Water Department, which comprised a part of the city water works, was before the city council.

In 1881, the Water Board submitted to the council the following estimate of the cost of such extension : " For engine buildings, wells, engine foundations, etc., $149,000 ; one engine, capacity 10,000,000 gallons, $75,000 ; one relief engine, capac-

ity 5,000,000 gallons, (based on using one of Mystic pumping engines,) $18,000; lands and reservoir, (No. 1,) capacity 15,-000,000 gallons, $169,000; land damages for reservoir (No. 3) and pipe lines, $28,000; pipe mains, force, and supply, $237,-000; add 10 per cent for superintendence, engineering, and contingencies, $67,600; total, $743,600."

The Water Board, November 17, 1884, submitted to the council another estimate of the cost of such extension, as follows: "For engine buildings, wells, engine foundation, connection chamber, $142,000; one engine, capacity 10,000,000 gallons, $60,000; one relief engine, capacity 5,000,000 gallons, $25,000; land and reservoir, capacity 15,000,000 gallons, including gate chamber, $210,000; land damages for reservoir No. 3, $28,000; pipe mains, force and supply, $231,000; add 10 per cent, engineering and contingencies, $69,600; total, $765,600."

On December 23, 1884, an order was duly passed by the city council, and approved by the mayor, to this effect: "*Ordered,* That the city treasurer be authorized to borrow, under the direction of the committee on finance, and at such a rate of interest as they shall determine, the sum of $766,000, which sum is hereby appropriated, and the Boston Water Board is authorized to expend the same for the extension of the high-service works of the Cochituate Water Department."

On December 31, 1884, the City Engineer, Henry M. Wightman, addressed to the Water Board a letter, in which he said: "The board should determine the pumping engine it will use, as such determination is necessary before a plan of the pumping station can be made. I am of the opinion that the improved Worthington engine will prove the most advantageous for the city, and as a three-million-gallon engine of this type is running at the Worthington pump works in New York, it would be advisable for the board to examine this engine before any decision is made."

The Water Board adopted plans and specifications for the proposed extension, requiring, among other things, two engines of the daily capacity of five million and ten million gallons, respectively, estimated by the board to cost from $85,000 to $93,000, and the discontinuance of the pumping station on

Elmwood Street, at the Highlands, and the engines and machinery therein. And on the third day of April, 1885, it sent this communication to the city council: " The plans for the extension of high service, as detailed ex-City Engineer, Joseph P. Davis, and the late City Engineer, Henry M. Wightman, require the establishment of a new pumping station at Chest-' nut Hill of larger capacity than the present one at the Highlands, and the discontinuance of the latter. Mr. Wightman, after a careful examination of the matter, concluded that it would be advantageous for the city to exchange if possible the small engines now in use for the larger ones required in the extension of the high service, and so recommended to the board. We therefore ask ' That the Water Board be authorized to exchange such pumping engines and machinery as are inadequate or of insufficient capacity for those of the capacity required by the plans and estimates of the new high-service extension.' "

On April 20, 1885, the following order, prepared by the chairman of the Water Board, and which had duly passed both branches of the city council, was approved by the mayor : "*Ordered*, That the Water Board be authorized to exchange such pumping engines and machinery as are inadequate or of insufficient capacity for those of the capacity required by the plans and estimates of the new high-service extension, the expense of such exchange to be charged to the appropriation for high-service extension."

On April 21, 1885, the Water Board visited New York and examined the improved or high-duty Worthington engine, and other engines in New York, Philadelphia, and Brooklyn, all of which they had done several times before subsequently to January 1, 1885, and on the previous visits had been accompanied by the City Engineer; and on April 24, 1885, received from the firm of Henry R. Worthington the following proposal, sent at the suggestion of the chairman of the Water Board in accordance with the recommendation of the City Engineer as above set forth : " We beg leave to submit the following proposal: For $106,575, will furnish and erect the pumps, etc., ready for continuous service. Whole to the satis-

faction of the City Engineer, and under such specifications as to details as may hereafter be agreed upon. Above price on assumption that we are to receive other engines and boilers on Elmwood Street. Boilers according to specifications accompanying — also feeding apparatus. We guarantee 100,000,000 foot pounds with 100 pounds of coal. Also materials and labor shall be first-class and equal to any other work furnished by us. We agree to complete work in eight months from date of signing contract." On the same day the Water Board returned the following answer : " Your proposal of April 24, 1885, to furnish high-service pumping plant for the city of Boston for the sum of one hundred and six thousand five hundred and seventy-five dollars ($106,575) is hereby accepted under the conditions that the detailed specifications and terms of the contract for the above-mentioned work shall be satisfactory to both parties concerned in the said proposal ; it being understood that the present pumping plant at the Elmwood Station is to be exchanged, as per the terms of your proposition."

The " other engines and boilers " and " pumping plant " above referred to were the engines and machinery of the pumping station on Elmwood Street at the Highlands, that were to be discontinued, and consisted of one small low-duty Worthington engine, made in 1878, and of the daily capacity of 3,000,000 gallons, and one engine and two boilers made by the Boston Machine Company, said engine being made in 1870, and of the daily capacity of 1,800,000 gallons — all of the aggregate value of $3500.

The distinguishing feature of the improved or high-duty Worthington engine was a " high-duty " attachment, the patent for which was owned and used exclusively by the plaintiffs. This device, so far as the parties to this suit knew, was the only one beside a fly-wheel that secured high economy of steam and fuel by enabling the steam to be cut off from the cylinder at an early point in the stroke of the piston without causing a loss of speed ; the effect of plaintiff's device and of the fly-wheel, together with the expansion of the steam left in the cylinder, being to carry the piston through the re-

mainder of its stroke without loss of speed. It avoided the vibration on the water column incident to the use of a crank and fly-wheel, and could be used on the duplex low-duty Worthington engine the motion of which was such that a fly-wheel could not be used with it. The duplex high-duty or low-duty Worthington engine was the only form of engine that secured an absolutely steady and regular flow of water, and whose steadiness and regularity of flow was in no way dependent on speed, and the low-duty duplex engine was, January 1, 1885, and ever since has been, manufactured by other parties besides the plaintiffs.

The plaintiffs had knowledge of the above ordinance requiring advertisement for proposals, but were informed by the chairman of the Water Board that the order of April 20, 1885, avoided any necessity of advertising in this instance; and on May 19, 1885, the Board, in the name of and claiming to act for the defendant, and whose whole authority in the premises, if any it had, was derived from the orders, ordinances, and statutes referred to, and the plaintiffs' firm, without any advertisement for proposals, entered into a contract the material portions of which were that Worthington should make and erect at Chestnut Hill reservoir two high-duty Worthington pumping engines, one of ten million and one of five million gallons daily capacity, and the boilers and appurtenances for the same; that the defendant should pay the plaintiffs therefor the sum of $106,575, and the pumping machinery, boilers, and all their appurtenances then located in the Highland pumping station, and valued at $3500, were to become the property of the contractors.

That agreement provided for payments to the contractors as follows: Twenty per cent of the contract price to be paid when the steam cylinders of the engines were cast; fifteen per cent, when the water cylinders were cast; fifteen per cent, when the steam cylinders of the engines were bored and planed; fifteen per cent, when both engines were erected; and fifteen per cent, when the boilers and engines were delivered at the pumping station at Chestnut Hill reservoir in Boston; such payments not to be made nor demanded unless the work

was progressing faithfully and to the satisfaction of the city engineer. The balance of the money due the contractor was to be paid, and the pumping machinery at the Highland pumping station was to become the contractor's property, upon the completion of the entire work according to the terms of the agreement, and "its connection to the high-service system of the city of Boston, all to the satisfaction of the said engineer."

On the date of the execution of the agreement a bond in the sum of $25,000, with sureties, running to the city of Boston, was delivered to the Water Board to secure the faithful performance of the contract. This bond was accepted for the city by the Board and attached to the contract, and, when this action was brought, was in possession of the City Auditor.

The pumping engines and machinery called for by the contract were of a capacity required by the plans and specifications for the new high-service extension, and were capable of doing the work contemplated by the orders of December 23, 1884, and April 20, 1885. The expenditure for piping was less than the estimate therefor, and the entire amount expended and agreed to be expended for the new high-service extension by the Water Board did not exceed the whole sum appropriated for that purpose.

The plaintiffs, before the commencement of this action, had performed so much of the work described in the contract as entitled them to receive 65 per cent of the contract price, and notified the defendant that they were ready and willing to deliver the engines and boilers and perform the remainder of the work described in the contract; but the defendant had refused to receive the same, or to pay any of the instalments named in the contract, although requested so to do, and notified the plaintiffs that it would not allow said engines and boilers to be delivered, and would not pay for the same.

In the year 1877 the Water Board and Henry R. Worthington contracted for an engine, at a cost of $20,000, without advertising therefor, and the price stipulated therein was paid by the city.

*Mr. George F. Edmunds* for plaintiff in error.

*Mr. Andrew J. Bailey* for defendant in error.

I. The ordinances cited provide that the Boston Water Board shall not make any contract estimated to involve more than ten thousand dollars until it has advertised for proposals therefor, and all persons having to do with the city must take notice of the ordinance. *Heland* v. *Lowell*, 3 Allen, 407; *S. C.* 81 Am. Dec. 670; *Taylor* v. *Lambertville*, 10 Atl. Rep. 809.

II. The Boston Water Board not having complied with this ordinance, the contract made by it was not the contract of the city, and is not binding upon it. *Brady* v. *Mayor of New York*, 30 N. Y. 312; *Nicholson Pavement Co.* v. *Painter*, 35 California, 699; *Zottman* v. *San Francisco*, 20 California, 96; *S. C.* 81 Am. Dec. 96; *Dean* v. *Charlton*, 23 Wisconsin, 590; *S. C.* 99 Am. Dec. 205; *The Floyd Acceptances*, 7 Wall. 666; *Petition of Laura E. Eager*, 46 N. Y. 100; *Lowell Savings Bank* v. *Winchester*, 8 Allen, 109; *Palmer* v. *Haverhill*, 98 Mass. 487; *Baltimore* v. *Eschbach*, 18 Maryland, 286; *Moran* v. *Miami County*, 2 Black, 722; *Agawam Nat. Bank* v. *South Hadley*, 128 Mass. 503; *Horton* v. *Thompson*, 71 N. Y. 513.

III. The fact stated in the sixteenth clause of the statement of facts has no bearing on this case. *Butler* v. *Charlestown*, 7 Gray, 12; *Sikes* v. *Hatfield*, 13 Gray, 347.

IV. The order did not annul or repeal the ordinance. *Third Nat. Bank* v. *Harrison*, 8 Fed. Rep. 721; *Chicago &c. Railway* v. *United States*, 127 U. S. 406; *United States* v. *Benson*, 31 Fed. Rep. 896; *Chew Heong* v. *United States*, 112 U. S. 536; *Gilson* v. *Emery*, 11 Gray, 430.

V. Nor can there be any claim of a ratification by the city. *Turney* v. *Bridgeport*, 55 Connecticut, 412.

Mr. Justice HARLAN, after stating the case, delivered the opinion of the court.

The facts, set forth in the written stipulation of the parties, bring this case within very narrow limits.

The grant of power to the Water Board, by the ordinance of March 22, 1876, was subject to the right of the city council, from time to time, by ordinances, orders, or resolutions, to instruct the Board, and to change and limit its authority, and, also, to the condition that no contract or purchase, estimated to involve an expenditure of more than ten thousand dollars, except a contract for the laying of pipe, should be made without an advertisement for sealed proposals in the mode prescribed by that ordinance.

The contract in question did involve an expenditure of more than ten thousand dollars, and, therefore, was one not within the authority of the Water Board to make, without first advertising for sealed proposals, unless, as the plaintiffs contend, the city council intended, by the ordinance of April 20, 1885, to dispense with advertising for proposals for exchanging such pumping engines and machinery as were found to be inadequate or insufficient, for engines and machinery required by the plans and specifications of the new high-service extension.

We are of opinion that the contention of the plaintiffs rests upon a sound interpretation of the ordinance of 1885. The city council was empowered by the statutes of the Commonwealth to create a Water Board with authority to exercise all the powers the city could exercise for the purpose of supplying the municipality with water, and to act as the agent of the city in establishing and maintaining works and appliances to that end. The city council having conferred upon the Water Board, subject to the conditions named, all the authority the city had in respect to such matters, that Board could have obtained, by exchange, the new engines and machinery specified in the agreement in question, upon duly advertising for sealed proposals. It would seem, therefore, that the only object of the ordinance of 1885 could have been to enable the Water Board to effect such exchange by contract, without advertising for proposals.

And there were reasons why that course should be pursued, if the intention was to secure, for the purposes of the high-service extension, the improved or high-duty Worthington

engine. The patent for that engine was owned and exclusively used by the firm of Henry R. Worthington, and the beneficial results ordinarily attending sealed proposals by competing bidders could not have been obtained in this instance by advertisement. Nothing could have been gained for the city by competition among bidders, one of whom only was entitled to use the patented engine it desired to obtain.

The city council had been fully informed by the Water Board of the cost of the high-service extension. The City Engineer had recommended the purchase of the improved Worthington engine. And the city council could not have been ignorant of the fact that the proposed new engines and machinery would cost not far from $100,000, and that plans and specifications, involving an expenditure of about that amount, had been adopted by the Water Board with the approval of the City Engineer. It was distinctly informed by the Board that the City Engineer had carefully considered the whole matter, and was of opinion that the public interests would be promoted if the small engines then in use were dispensed with altogether, by "exchange if possible," and the larger ones, required in the extension of the high service, substituted for them. The city council was, therefore, asked to give the board authority "to exchange" such pumping engines and machinery as were inadequate or insufficient for such as were required by the plans and estimates of the new high-service extension — an authority that need not have been specially conferred, if the Board was to pursue the method of advertising for proposals. The authority asked was given, not generally, but with express reference to particular plans and estimates, the expense of the exchange to be charged "to the appropriation for high-service extension." As that appropriation was based upon estimates furnished by the Water Board to the city council; as those estimates upon their face showed that the expense of engines and machinery required in the high-service extension would be large in comparison with the value of the small engines and machinery then in use and which were to be discontinued, the suggestion that the city council could not have contemplated an "exchange" of engines

and machinery worth only $3500 for engines and machinery worth over $100,000, is of little moment. It is manifest that the city council was aware, when it passed the ordinance of April 20, 1885, that the Water Board had in mind the new improved or high-duty Worthington engine. Interpreting that ordinance in the light of all the circumstances preceding and attending its passage, we are not at liberty to doubt that the city council was aware of the recommendations of the City Engineer, or that the object of the ordinance was to enable the Water Board, by contract, without advertising for sealed proposals from bidders, to exchange the engines and machinery then in use for the new and improved Worthington engine, exclusively manufactured by the firm of Henry R. Worthington. The Water Board was authorized by that ordinance to create a debt for engines and machinery, not without restriction as to cost, but of the capacity "required by the plans and estimates of the high-service extension," lessened by such amount as could be obtained, in exchange, for the insufficient engines and machinery then in use. The city council thus had in view the value of the inadequate engines and machinery then in use, and the value of the new engines and machines; the cost of the latter being made known to them by the plans and estimates submitted by the Water Board. The better interpretation of the ordinance of 1885 is, therefore, that the exchange, authorized to be made, was expected to be accomplished without resorting to an advertisement for proposals.

This conclusion has been reached independently of the fact that some years before the present transaction the city paid the sum of $20,000 for an engine obtained by the Water Board from Henry R. Worthington, by contract, without advertising for proposals. A single instance of that kind, showing a departure from the ordinance regulating the subject of contracts and purchases by the Water Board, cannot be allowed to operate as a repeal of that part of the ordinance requiring an advertisement for proposals where the Board makes a contract or purchase involving an expenditure of more than ten thousand dollars. We place our decision in the present case upon what

we regard the fair interpretation of the ordinance under which the exchange in question was made.

It was agreed that if, on the facts stated by the parties, the city was liable, judgment should be entered in favor of the plaintiffs for the sum of $35,000, with interest from April 15, 1889. We are of opinion the city is liable upon the contract made by the Water Board.

*The judgment is reversed, and the cause is remanded, with directions to enter judgment in favor of the plaintiffs accordingly.*