HYLTON ET UX. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 298, September Term, 1972.]

*Per Curiam Order December 29, 1972.*

*Opinion Filed February 26, 1973.*

## PER CURIAM ORDER

For reasons to be stated in an opinion to be filed later, it is this 29th day of December, 1972

ORDERED by the Court of Appeals of Maryland that the decree of Circuit Court No. 2 of Baltimore City be,

and it is hereby, affirmed with costs to be paid by the appellants; and it is further

ORDERED that the mandate be issued forthwith.

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Norman P. Ramsey,* with whom were *H. Thomas Howell* and *Alan N. Gamse* on the brief, for appellants.

*George L. Russell, Jr., City Solicitor,* and *Franklin G. Allen,* with whom were *Ambrose T. Hartman, Deputy City Solicitor, Allan B. Blumberg, Assistant City Solicitor,* and *Piper & Marbury* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court.

This appeal presents the question whether a contract between the Mayor and City Council of Baltimore (the City) and Monsanto Enviro-Chem Systems, Inc. (Enviro-Chem) for the construction of a resource recovery solid waste disposal system was concluded in violation of the competitive bidding requirements contained in § 4 of Article VI of the City's Charter. The lower court (Ross, J.) determined that there was no such violation, as claimed by appellants, taxpayers and residents of Baltimore City. The appeal to us is from the court's decree declaring the contract valid and binding upon the parties, notwithstanding the fact that it had been negotiated and executed without competitive bidding.[1]

By the terms of the contract, Enviro-Chem agreed, for $14,742,000, to construct a resource recovery solid waste disposal plant for the City utilizing its "Landgard" non-patented proprietary process for disposing of one thou-

---

1. On December 29, 1972, we issued a per curiam order affirming the decree of the lower court; we now express the reasons for that affirmance.

sand tons per day of garbage and trash by pyrolysis [2] and recovering saleable by-products therefrom (resource recovery), *viz.*, usable steam, glassy aggregate and ferrous metals. The agreement specified that $6,000,000 of the contract price would be paid by the City from grant funds which it would receive from the Environmental Protection Agency (EPA) of the United States; that $4,000,000 would be paid from funds received by the City through the Maryland Environmental Service (MES), an agency of the State of Maryland; and that the remainder of the contract price would be paid by the City from its own resources.

The contract, which was finalized on December 8, 1972, was executed against this factual background: In an effort to find a satisfactory solution to its problem of disposing annually of approximately 540,000 tons of garbage and trash, the City initiated an in-depth study in early 1970 of all available technology in the field of solid waste disposal; the study included on-site investigations of operational facilities throughout the nation. As a result, the City prepared specifications and sought competitive bids in 1970 for a seventeen-year service contract for a one thousand ton per day solid waste disposal system, operational within State pollution control requirements. The five bids received by the City failed to comply with the specifications set forth in the bidding documents and all bids were rejected. The City thereafter explored the possibility that under the Solid Waste Disposal Act of 1965, as amended by the Resource Recovery Act of 1970, 42 U.S.C. §§ 3251, *et seq.* (1970), it could obtain a grant of funds from the federal government to assist it in constructing its own solid waste disposal system. By those enactments, the Congress of the

---

2. Webster's Third New International Dictionary (1961 Ed.) defines "pyrolysis" as "chemical decomposition or other chemical change brought about by the action of heat regardless of the temperature involved." In the present context, pyrolysis refers to the chemical process whereby shredded waste is heated in an oxygen deficient atmosphere, resulting in conversion of organic matter into gaseous products and a residue.

United States recognized that the problem of solid waste disposal was a matter of national concern necessitating federal action through financial and technical assistance to municipalities "in the development, demonstration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid-waste disposal practices." 42 U.S.C. § 3251(a)(6). Acting through EPA the federal government was empowered to make grants to selected municipalities for the demonstration of resource recovery solid waste disposal systems, the grants being limited in amount to 75% of project cost, including costs of design, construction, operation and maintenance. 42 U.S.C. § 3254b. The grants were in furtherance of the congressional purpose "to promote the demonstration, construction, and application of solid waste management and resource recovery systems which preserve and enhance the quality of air, water, and land resources." 42 U.S.C. § 3251(b)(1). In addition to conditions imposed by the provisions of 42 U.S.C. § 3254b (b)(1) and 40 C.F.R. §§ 30.100, et seq. (1972), proposals to be submitted by municipalities applying for grants were to be judged on requirements and criteria specified in an EPA document entitled "Instructions for Submitting a Pre-application for a Resource Recovery Systems Demonstration Grant" (the EPA Instructions). Under EPA standards, the proposed project could not duplicate a resource recovery system that had already been developed and operated at full scale; however, it could not be an untested system because the EPA Instructions provided that:

> "The feasibility of the unit processes of the proposed system must have been satisfactorily demonstrated in a pilot plant application at a sufficient rate to enable a reliable projection of the technical and economic performance of the proposed systems to be made. The operation must have been documented in a formal technical report."

The EPA Instructions further provided that a minimum of 60% (by dry weight) of the solid waste input must be converted to useable energy or recovered as saleable materials; that purchase commitments, in the form of contractually binding purchase agreements or letters of intent, for at least 50% of the saleable materials must be included with the grant application; and that a market analysis defining markets for saleable products, particularly those for which no purchase commitments were included in the proposal, should be presented.

The action taken by the City to obtain an EPA demonstration grant was thoroughly documented by F. Pierce Linaweaver, the City's Director of Public Works, who, in an affidavit included in the record before us, stated:[3]

"It then became necessary for us to choose a system upon which to base our application. At that point in time we reviewed all of the proposed solutions to Baltimore's solid waste disposal problem in search of the one system that we felt was able to solve the problem and at the same time be eligible for Federal funding. In order to determine the system that best suited our situation, certain criteria were used. The system which we were going to choose had to convince us that a scale-up from a prototype to 1,000 tons per day could be achieved. Another factor that was to be considered in the scale-up was that the system at 1,000 tons per day was economically justifiable when compared to other scale-up magnitudes. It was absolutely necessary that the system meet all pollution control standards of the State. The system's resource recovery would have to be at a maximum and produce by-products which could be marketed. In addition, it cannot be overlooked

---

3. Linaweaver did not testify at trial, but it was stipulated below that were he to be called as a witness, his testimony would be in substantial conformity with his affidavit. The facts in the affidavit were not contraverted at trial.

that a choice of a system had to be one which we felt would qualify for Federal funding under the Resources Recovery Act of 1970.

\* \* \*

"We believed that in preparing the City's application for a grant under the Act, our previous competitive bidding in 1970 as well as our continuing examination of all existing technologies had given the City a complete awareness of the state of the art in solid waste disposal systems.

\* \* \*

*It cannot be overlooked that the application could not be submitted with alternatives but had to have the City's choice of one system.*" (Emphasis supplied.)

The City rejected incineration, composting, landfilling and "incineration residue separation" as unsuitable to its needs, a factual assertion which was not challenged at trial. Several other systems using pyrolysis were investigated and rejected. As to these, Linaweaver explained in his affidavit:

". . . there were several other companies proposing solid waste disposal systems using to varying extents a pyrolysis process, among them the Garrett Research and Development Company, Torrax Systems, Inc., and Union Carbide, Incorporated. None of these systems, however, had advanced to the point where they were ready for demonstration on a size of 1,000 tons per day. Garrett Research and Development was not chosen because it had not advanced beyond the bench scale level. Torrax Systems, Inc., although it had a larger prototype, was not chosen because it was having difficulties with its then existing plant. Union Carbide, Incorporated, was not chosen because its resource recovery was not satisfactory. In any event,

> none of the systems had advanced to the point where they were ready for demonstration on a size of 1,000 tons per day scale."

The substance of Linaweaver's affidavit was confirmed and amplified by Dale Chapman, Vice President in charge of operations for Enviro-Chem, who testified at the trial that Garrett's pilot plant had operated at a five tons per day level, had not yet published any information on its pollution levels, and produced fuel oil as the primary by-product; that Torrax's pilot plant, with a capacity of 150 tons per day, had not performed consistently at that level, had not yet produced reliable information on air pollution levels, and produced steam and iron flocs; that Union Carbide had operated at four tons per day, and had not yet published information on the level of air pollution. In addition to these three pyrolysis systems, there was evidence of the existence of the so-called Melt-Zit process developed by American Thermogent and later acquired by Process Plants Inc.; that the Melt-Zit process was technically not a pyrolytic process, but rather high temperature incineration; that it operated at a one hundred tons per day level, did not meet Maryland pollution standards, and produced by-products similar to Torrax, *i.e.*, steam, iron flocs and a slag residue or frit of metal and glass chemically and by temperature fused. Both Linaweaver and Chapman unequivocally stated that Enviro-Chem was unique, of the some seventy companies investigated by the City, in possessing all the characteristics that the City was seeking.[4]

Based on this evidence, the City selected Enviro-Chem's "Landgard" pyrolysis process as the subject of its demonstration grant application. In enumerating the rea-

---

4. Evidence in the record shows that the particular resources recovered by Enviro-Chem are marketable by the City. The steam produced will be sold to the Baltimore Gas & Electric Company to provide energy for the downtown area. In addition to steam, the Enviro-Chem system produces, per 1,000 tons of trash and garbage, seventy tons of clean ferrous metal, having a substantial market value, and 170 tons of glass, useful as a road-building material.

sons for the City's selection of Enviro-Chem, Linaweaver said in his affidavit:

"In addition to the fact that this system had been tried on a prototype basis which made it clear to us that the technology would work, and the fact that there were opportunities for significant resource recovery, this company was willing to guarantee that it could meet the City's 1,000 tons per day requirements and the stringent pollution control standards in the State of Maryland. This is the only company that was willing to make such a guarantee. They also guaranteed the pay back of $4,000,000 of the City's risk money in the unlikely event that the system would not work. This system had been proven through the prototype stage and was ready for demonstration on a size of 1,000 tons per day scale. This was also the only system which satisfied our size requirements of the 1,000 tons per day.

\* \* \*

I should reiterate that this was the only system by any private company where the technology had been advanced to the point in its development where we were confident that the technology could satisfy our requirements on a size of 1,000 tons per day, meet our resources recovery goals, and meet pollution control requirements in the State of Maryland. In our opinion this system was the best system for Baltimore and its needs irrespective of the Federal funding.

\* \* \*

*"This system was the only one which was technologically advanced to meet all the requirements of Baltimore City."* (Emphasis supplied.)

The City's application was one of sixty-six received by EPA; the proposals were evaluated by EPA and nine

were selected for further consideration. On September 8, 1972, EPA awarded demonstration grants to three applicants: Baltimore ($6,000,000), San Diego ($2,900,-000) and Lowell, Massachusetts ($2,400,000).

Subsequent to the award, on November 30, 1972, EPA notified the City that:

> ". . . the awarded EPA funds can only be expended to demonstrate the Landgard solid waste pyrolysis system developed by Monsanto Enviro-Chem Systems, Inc.
>
> * * *
>
> . . . the subject application was approved by EPA to demonstrate the Landgard system. No evidence has come to our attention that would indicate that anyone other than Monsanto Enviro-Chem Systems, Inc. could satisfactorily design and construct the Landgard system."

On condition that the project be that of Enviro-Chem, as specified in the EPA grant award, MES awarded $4,-000,000 to the City to be applied to the contract price, as authorized by the provisions of Maryland Code (1957, 1971 Repl. Vol.), Article 33B, § 4.

## I

It is undisputed that the contract between the City and Enviro-Chem is a contract for a public work, that it involves an expenditure of more than $5,000 and that the City neither advertised nor received bids in accordance with its Charter (1964 Rev.), Article VI, § 4 (b), which provides in pertinent part:

> "(b) In contracting for any public work, or the purchase of any supplies, materials, and equipment . . . or of any services other than professional services, involving an expenditure of five thousand dollars or more, for the City or by any municipal agency, advertisements for

proposals for the same shall first be published at least twice in two or more daily newspapers published in Baltimore City unless otherwise provided by the Charter.

\* \* \*

"The contract for any public work or the purchase of any supplies, materials, and equipment . . . or of any services other than professional services, involving an expenditure of five thousand dollars or more shall be made by the Board of Estimates in the manner provided in sub-section (g)."

Article VI, § 4 (g) of the Charter details the mechanism for opening and selecting bids and provides that the Board of Estimates "shall award the contract . . . to the lowest responsible bidder" or else "shall reject all bids."

Appellants contend that the Charter requirements are mandatory. Relying upon *Hanna v. Board of Education of Wicomico County,* 200 Md. 49, 87 A. 2d 846 (1952), and *Maryland Pavement Co. v. Mahool,* 110 Md. 397, 72 A. 833 (1909), they claim that failure to adhere to the competitive bidding requirements of the Charter renders the contract in issue null and void. Appellants contend that there can be no exception to the competitive bid requirements other than those expressly outlined in § 4 (d) of the Charter, which provides:

"(d) When any supplies, materials, equipment, or services are of such a nature that no advantage will result in seeking or it is not practicable to obtain competitive bids or when the need for such supplies, materials, equipment, or services is of an emergency nature, and a certification to that effect is filed by the Department of Finance with the Board of Estimates, the provisions of subsection (b) may be dispensed with, but such purchase shall not be

made, nor shall the City incur any obligation
therefor, until approval of the Board of Esti-
mates. . . ."

Clearly, the § 4 (d) exceptions from the competitive
bidding requirements do not expressly cover contracts
for public works involving expenditures of $5,000 or
more. The relevant inquiry, therefore, is whether § 4 (b)
admits of any exceptions other than those enumerated
in § 4 (d).

The general purpose of competitive bid requirements
is "to obtain unrestricted competitive bidding for con-
tracts . . . and thereby to safeguard public funds by
preventing favoritism, collusion and extravagance."
*Hanna v. Board of Education of Wicomico County, supra,*
200 Md. at 54, 87 A. 2d at 848; *Stoll v. Mayor and City
Council of Baltimore,* 163 Md. 282, 288, 162 A. 267, 269-
70 (1932). McQuillin has summarized the general law
as follows:

"The provisions of statutes, charters and or-
dinances requiring competitive bidding in the
letting of municipal contracts are for the pur-
pose of inviting competition, to guard against
favoritism, improvidence, extravagance, fraud
and corruption, and to secure the best work or
supplies at the lowest price practicable, and they
are enacted for the benefit of property holders
and taxpayers, and not for the benefit or enrich-
ment of bidders, and should be so construed and
administered as to accomplish such purpose
fairly and reasonably with sole reference to the
public interest. These provisions are strictly
construed by the courts, and will not be ex-
tended beyond their reasonable purport. Such
provisions must be read in the light of the rea-
son for their enactment, lest they be applied
where they were not intended to operate and
thus deny municipalities authority to deal with

problems in a sensible, practical way. . . ." 10 McQuillin, *Municipal Corporations* 321-22, § 29.-29 (3d. ed. rev. vol. 1966).

Utilizing this approach, courts have allowed exceptions to a seemingly mandatory requirement of competitive bids in diverse types of unique situations. One line of cases concerns the purchase of patented objects: *Consentino v. City of Omaha,* 186 Neb. 407, 183 N.W.2d 475 (1971) (City's choice of patented process for waste treatment not subject to competitive bids) ; *Hodgeman v. City of San Diego,* 53 Cal. App. 2d 610, 128 P. 2d 412 (1942) (parking meters, each covered by a patent, were not standardized to point where competitive bidding was feasible or necessary) ; *Cf. Worthington v. City of Boston,* 152 U. S. 695, 704-05, 14 S. Ct. 737, 740, 38 L. Ed. 603, 606 (1894) (nothing could have been gained by competition among bidders, only one of whom was entitled to use the patented engine the City desired to obtain). Our predecessors recognized the futility of insisting on competitive bids where patented articles were involved in a dictum in *Mayor and City Council of Baltimore v. Flack,* 104 Md. 107, 144-45, 64 A. 702, 716 (1906) :

> "In many of the cases alluded to . . . [in the course of the court's opinion] the further proposition is decided, that such provisions as secs. 14 and 15 of the charter [competitive bid requirements] do not apply when the city proposes to purchase a patented article, because competitive bidding for such an article would be an idle and useless form . . . . If the proposition were directly involved we should have no difficulty in yielding our assent to it, in a case where the patented article could not in the nature of the thing, be bid on or furnished except by the owner or licensee of the patent."

Judicially recognized exceptions to competitive bid statutes have not been limited to patented articles. See 10 McQuillin, *supra* § 29.34 at 339-40; 1 Antieau, *Munici-*

*pal Corporation Law* 757-60, § 10.28 (cum. supp. 1972). In *Whelan v. N.J. Power & Light Co.*, 45 N. J. 237, 212 A. 2d 136 (1965), the competitive bid statute was held not to apply to the sale of City land to a utility for use as a power station since, by contract, the only permissible buyer was the utility. In *Mullen v. Town of Louisburg*, 225 N. C. 53, 33 S.E.2d 484 (1945), it was held that the competitive bid statute did not apply to the wholesale purchase of electricity for there could be but one bidder and one price, the rate fixed by law. To the same effect, *see Marino v. Town of Ramapo*, 326 N.Y.S.2d 162 (1971); *Kingsley v. City & County of Denver*, 126 Colo. 194, 247 P. 2d 805 (1952).

All of these cases are, of course, factually distinguishable from the instant case; however, a common thread runs through them all, namely, that where the object to be acquired is truly unique it would constitute a futile act, in the name of a policy which would not be served, to require competitive bidding. There are, as this court stated in *Mayor and City Council of Baltimore v. Flack, supra*, "two kinds of competition [underlying the competitive bidding policy]—the one, competition between different *things* which will equally answer the same general purpose; and the other, competition between the prices bid respectively upon *each* of those distinct things." 104 Md. at 128, 64 A. at 710. Where, therefore, the thing sought to be obtained by a municipality can by its nature be furnished by one and only one source, competition simply is not possible.

In contracting with Enviro-Chem, the City recognized that that company had no monopoly on pyrolysis as a technology for disposal of solid waste. On the contrary, the City always recognized that a number of other companies have such processes in various states of development. But, as reflected by the record, the processes differ materially in the extent to which they have been proven, in the equipment that they use, in the order in which the equipment is arranged, in the manner in which

they operate, in the resources they recover, and in the results which they achieve. The City was not merely seeking a system by which to dispose of its solid wastes, with a wide range of alternatives open to it based upon differing characteristics between available systems; what it required was a particular system, materially different from all others, enabling it successfully to compete with other municipalities for a demonstration grant. As heretofore indicated, to apply for a grant the City had to pre-select a particular process and persuade EPA that the process it selected ought to be demonstrated so that, if it worked on a full scale, other municipalities could adopt it without misgivings. As so cogently observed by the City in its brief:

> "To be eligible for a grant the process must meet requirements that reduce the [competing] candidates to a few. It must never have been demonstrated on a full scale, because if it had been so demonstrated there would be no need for a demonstration grant. On the other hand, EPA requires that the system must have been demonstrated reliably in a pilot plant. The winning city will be the one proposing the process that looks best to EPA.
>
> "Beyond that, it would obviously reduce the City's chance to win a grant if the City were to propose a particular process that was already the subject of a rival application by another city, because EPA would be unlikely to make two grants to demonstrate the same project or to favor the later over the earlier applicant for the same process. It is therefore clear that to apply for a grant it was necessary to select a process and that to select a particular process is to designate only that process and to exclude any rival process, for they are all materially different.

* * *

"Therefore once the City had selected the Enviro-Chem process competition did not exist, and there can be no competitive bidding if there is only one source of the thing desired. . . ."

The singular nature of the contract between the City and Enviro-Chem, created by the factors hereinbefore enumerated, and particularly the immediate needs of the City to dispose of solid waste in large quantity (1,000 tons per day), to recover resources saleable in the area, to meet the pollution requirements of State law, and the need to obtain funding assistance through an EPA demonstration grant, narrowed the "competitors" capable of fulfilling the City's need to one. In other words, in the language of *Flack, supra,* no competition existed "between different *things* which will equally answer the same general purpose." The trial judge found from the evidence that the City made a determination "that the proprietary process of Monsanto [Enviro-Chem] best suits the needs of the City"; that there was no evidence or suggestion of favoritism or corruption; that the circumstances presented not only the clear impracticability, but "the virtual impossibility" of competitive bidding; and that the policy behind the competitive bid statute—avoidance of corruption and economy to the taxpayers of Baltimore—had been met without competitive bids.

Appellants argue that since the municipal power to contract must be strictly construed (citing *Mayor and Council of Mount Airy v. Sappington,* 195 Md. 259, 263, 73 A. 2d 449, 450 (1950), and *Mayor and City Council of Baltimore v. Canton Co.,* 186 Md. 618, 631, 47 A. 2d 775, 781 (1946)) any reasonable doubt as to the existence of municipal power must be resolved against the City. They maintain that courts should not attempt, under the guise of construction, to imply the existence of exclusions in Charter provisions in addition to those expressly stated, citing *Town of Somerset v. Montgomery County Board of Appeals,* 245 Md. 52, 71-72, 225 A. 2d 294, 306 (1966) ; *State Insurance Commissioner v. Na-*

*tionwide Mutual Ins. Co.,* 241 Md. 108, 117, 215 A. 2d 749, 754-55 (1966).

While we agree with appellants' statement of the law, we find it inapplicable to the present case. In *Kirkwood v. Provident Savings Bank,* 205 Md. 48, 55, 106 A. 2d 103, 107 (1954), we noted:

> ". . . the maxim *'expressio unius est exclusio alterius'* . . . meaning that the expression of one thing implies the exclusion of another thing not mentioned, is not a rule of law, but merely an auxiliary rule of statutory construction applied to assist in determining the intention of the Legislature where such intention is not manifest from the language used. It should be used with caution, and should never be applied to override the manifest intention of the Legislature or a provision of the Constitution. . . ."

We do not think that the mere omission of "public works" from the express exceptions contained in § 4 (d) represents an expression of deliberate exclusion calculated to require, under all circumstances, that competitive bids be obtained for all public works even where, by the nature of the project, no competition exists; if such were part of a deliberate plan, some mention of it would likely have been made in the Charter Revision Committee Notes, but there is none. Indeed, when the § 4 (d) exceptions were first inserted in the 1946 revision of the Charter as § 37 (b), there was little reason for anyone to foresee technological advances which could make public works as unique as supplies, materials, equipment and services.

We recognize the important protection provided by competitive bid provisions. We hold only that in the peculiarly unique factual situation of this case, competitive bidding was not required by the Charter. In so concluding, we are mindful of the full range of power vested in the City, by Article II, § (3) of its Charter, "[t]o accept from the United States or any agency thereof any

grant or aid of any character"; and of related provisions contained in Maryland Code, Article 96 (1957, 1964 Repl. Vol.), §§ 49, 50.

## II

Nor do we find merit in appellants' remaining contention that the contract is invalid for failure to comply with the performance bond requirements of the Maryland Code and the City Charter. Maryland Code (1957, 1964 Repl. Vol.), Article 90, § 11 (a), provides in pertinent part that:

> "(a) . . . Before any contract exceeding five thousand dollars ($5,000) in amount, for the construction . . . of any . . . public work or improvement of the State of Maryland, or of any . . . city . . . is awarded to any person, he shall furnish to . . . such . . . city . . . the following bonds which shall become binding upon the award of the contract to such person, who is hereinafter designated as 'contractor':
>
> "(1) A performance bond executed by a surety company authorized to do business in this State satisfactorily to the public body awarding the contract, and in such amount as it shall deem adequate, for the protection of the public body."

The performance bond provisions in the City's Charter are found in Article VI, § 4 (g), which provides:

> "The successful bidder shall promptly execute a formal contract to be approved as to its form, terms, and conditions by the City Solicitor, and such bidder shall also execute and deliver to the Mayor a good and sufficient bond to be approved by the Mayor in the amount of the contract price. . . ."

The contract requires a performance bond in the amount of the contract price and provides:

> "Enviro-Chem shall furnish a bond covering the payment of all obligations for labor, materials and equipment arising out of construction of the Plant and a bond covering the faithful performance of the obligation of Enviro-Chem to complete construction of the Plant in accordance with the detailed drawings and specifications to be prepared by Enviro-Chem hereunder. Said bonds shall be in the amount of the Contract Price and issued by sureties authorized to act as a surety by the State of Maryland. The bond covering performance shall not cover any obligation of Enviro-Chem which must be performed or may arise subsequent to completion of construction including, but not limited to, demonstration of the performance guarantees and Baltimore shall have no claim against the surety on the bond with respect to any such obligation."

Appellants claim that the performance bond must, but does not, cover the *entire* contract as required by the holding in *Board of Education of Carroll County v. Allender*, 206 Md. 466, 112 A. 2d 455 (1955).

We think the performance bond provided by Enviro-Chem fully complies with the quoted provisions of law, notwithstanding the fact that it did not cover Enviro-Chem's post-construction performance guarantees. Nothing in *Allender* dictates a contrary conclusion.