KENNEDY, Justice.
General Electric Company filed an action for equitable relief, seeking both to enjoin the performance of certain contracts entered into by the City of Mobile (the “City”) and Motorola Communications and Electronics, Inc. (“Motorola”) and to have those contracts voided as violating Ala.Code 1975, § 41-16-61 et seq., which address competitive bidding for contracts entered into by the City. The trial court denied General Electric’s request for a preliminary injunction and other relief; it also denied a permanent injunction and the other relief sought by General Electric. General Electric appealed both the denial of the preliminary injunction and the denial of the permanent injunction; we have consolidated the two cases for appeals.
General Electric challenges three sets of provisions in two contracts. One contract, entered into September 27, 1989, included provisions (1) for the City to purchase from Motorola a fire alerting system for $126,-873; the system would be operated at an additional cost of $50 monthly; and (2) for an equipment lease-purchase agreement for the sum of $619,520, payable over seven years in installments of $110,264.[1] The second contract, entered into October 1, 1989, gave Motorola a one-year service contract for the maintenance of all the City’s Fire and Police Department radio-communications equipment; the value of that contract, including a one-time equipment-renovation charge, was $99,486.
Chapter 16 of Title 41, Alabama Code 1975, addresses “Public Contracts,” and under Article 3 of Chapter 16, which addresses “Competitive Bidding on Contracts of Certain State and Local Agencies, etc.,” two provisions are pertinent:
“§ 41-16-50 Contracts for which competitive bidding required....
“(a) All expenditure of funds of whatever nature for labor, services or work, or for the purchase of materials, equipment, supplies or other personal property involving $5,000.00 or more, and also the lease of materials, equipment, supplies or other personal property where the lessee is or becomes legally and contractually bound under the terms of the lease, to pay a total amount of $5,000 or more, made by or on behalf of ... county commissions and the governing bodies of the municipalities of the state and the governing boards of instrumentalities of counties and municipalities, including waterworks boards, sewer boards, gas boards and other like utility boards and commissions, except as hereinafter provided, shall be made under contractual agreement entered into by free and open competitive bidding on sealed bids, to the lowest responsible bidder....”
“§ 41-16-54 Advertisement and Solicitation of bids
“(a) All proposed purchases in excess of $5,000 shall be advertised by posting notice thereof on a bulletin board maintained outside the purchasing office and in any other manner and for such lengths of time as may be determined; provided, however, that sealed bids shall also be solicited by *1314 sending notice by mail to all persons, firms or corporations who have filed a request in writing that they be listed for solicitation on bids for such particular items as are set forth in such request....”
At the hearing on General Electric’s motion for a permanent injunction, Motorola and the City stipulated that the contracts were not entered into pursuant to the competitive bidding requirements of the provisions quoted above. Motorola and the City have both filed briefs on appeal.
The challenged contracts are obviously subject to the competitive bidding requirements of §§ 41-16-50(a) and 41-16-54(a), unless there is an exception by which the contracts can escape the coverage of those provisions. Motorola argues that the contracts are subject to the so-called “sole source” exception of § 41-16-51(a)(ll), which provides:
“[T]he competitive bidding requirements of this article shall not apply to:
[[Image here]]
“(11) Contractual services and purchases of commodities for which there is only one vendor or supplier....”
We first address whether Motorola was the sole source of the goods and any services provided for in the September 27 contract; then we address whether Motorola was the sole source for the services provided in the October 1 contract. There is no Alabama caselaw addressing the “sole source” exception. The cases cited by the parties are not sufficiently similar factually to provide guidance. See, e.g., Inter-Island Transport Line, Inc. v. Government of Virgin Islands, 539 F.2d 322 (3d Cir.1976); General Engineering Corp. v. Virgin Islands Water & Power Authority, 636 F.Supp. 22 (D.V.I.1985), affirmed, 805 F.2d 88 (3d Cir.1986); Hylton v. Mayor & City Council of Baltimore, 268 Md. 266, 300 A.2d 656 (1972).
The specifications provided by the City’s sheriff’s office, Fire Department, and Department of Public Works requested an “800 MHz trunked radio communication system” for the fire-alerting system and for radio-communications equipment. The record indicates that “800 MHz trunking” represents a technological breakthrough in the field of radio communications. In conventional or traditional radio communications, a system user must manually select the channel on which he wishes to speak; if that channel is then in use, he must wait for the channel to clear or else manually tune to another channel. In a “trunked” system, when someone desires to speak on the radio, a computer searches through a group of pooled channels and automatically funnels users to an open channel on a “first come, first served” basis. The result is a much more efficient use of any given set of frequencies, so that five trunked channels are roughly equivalent to 8 or 10 channels in conventional operation. The designation “800 MHz” simply refers to a band of radio frequencies. The system allows radio communication between the different government agencies (e.g., a fireman can radio a police officer), whereas before getting this system the employees of an agency could communicate only by radio with other employees of the same agency. The system prioritizes use of the radio channels.
General Electric presented undisputed evidence that it could provide an 800 MHz trunked radio communication system with the fire-alerting system and radio-communications equipment requested in the specifications. The briefs of the parties and the record provide excellent technical descriptions of how both General Electric and Motorola can provide such systems, but we will not unduly lengthen this opinion by reproducing those descriptions. Instead, we note that Motorola contends that two factors make it, under the unique facts of this case, the sole source for the 800 MHz trunking system for the purpose of the competitive bidding laws: (1) it owns a tower from which it can broadcast the 800 MHz system and (2) it has computer technology to “partition” the radio communications. A fair reading of the trial court’s order denying the permanent injunction indicates that it held that Motorola was the sole source because of those two reasons.
*1315 Motorola owns a 600-foot tower that it originally built for commercial use; on that tower Motorola has installed equipment that will allow it to broadcast the 800 MHz radio communications and fire-alerting system. Motorola argues, and the trial court held, that GE could not provide a facility to house the equipment related to the system.
Witnesses for General Electric testified that Mobile’s General Electric franchise, Bibbins & Rice, has had an 800 MHz trunked commercial user system in Mobile since 1982; that it is operated from the WABB radio tower in west Mobile; that Bibbins & Rice leases the tower from WABB under a five-year renewable contract; that Bibbins & Rice would allow General Electric to use the 800 MHz antenna if General Electric wished to provide the City with an 800 MHz communications system; and that the equipment necessary to the system can be housed in a building owned by Bibbins & Rice at the base of the WABB tower. That testimony was undisputed. Bibbins & Rice is in the marine and industrial electronics and radio-communications sales and service business.
The evidence further indicated that the City could obtain a radio-communications capability comparable to that of General Electric and Motorola’s towers by using the tower located at the “Emergency Operations Center,” which is a site in Springhill jointly owned by the City and Mobile County. The Police, Fire, and Public Works Departments currently operate radio-communications systems from that tower and house related equipment in the building at the base of the tower.
Considering the evidence discussed, we hold that the trial court improperly determined that Motorola’s tower made it the sole source for the radio-communications and fire-alerting systems of the September 27 contract. Motorola, nevertheless, maintains that its equipment’s “partitioning” capability makes it a sole source. The record indicates that the partitioning capability is indeed unique to Motorola. It allows the City to have three radio channels dedicated to its use, which others can also provide, but, uniquely, it allows the City to share the use of four commercial channels in two specific situations. The first situation involves a feature called “telephone interconnect,” which allows one to make and receive calls on a radio to and from a telephone land line. In the September 27 contract, the City and Motorola agreed that the telephone interconnect feature was not to be included in the initial radio units purchased by the City, however. Second, the City could use the four additional channels for its fire-alerting system.
The specifications provided by the City’s sheriffs office, Fire Department, and Department of Public Works for the fire-alerting system and radio-communications equipment do not require the “partitioning” feature of Motorola’s system. • Accordingly, the “partitioning” feature is an option that is additional to the City’s specifications. The record indicates that General Electric could provide the system described in the specifications.
We are thus presented with this question: At what point does an additional feature, such as “partitioning,” that is not required in the specifications, make a good or service, such as Motorola’s system, so unique that its producer can be considered the sole source of the good or service for the purpose of Alabama’s competitive bidding laws? Most goods and services are to some extent “unique”; indeed, the evidence indicates that large portions of the system that General Electric proposed in the place of Motorola’s system are patented and work in a “unique” fashion. Accordingly, we will not hold that a good or service’s “uniqueness” alone can qualify the producer or supplier of the good or service as a “sole source” of a good or service under Alabama’s competitive bidding laws. Instead, to so qualify under § 41-16-51(a)(ll), the good or service offered must be unique; and that uniqueness must be substantially related to the intended purpose, use, and performance of the good or service sought; and the entity seeking to be declared a “sole source” must show that other similar goods or services cannot per *1316 form the desired objectives of the entity seeking the goods or services.
Motorola perhaps meets the first two portions of the test above, but it fails the third. The trial court did not appropriately consider the availability of systems other than Motorola’s system that could provide the fire-alerting system and radio-communications equipment described in the City’s specifications. “Partitioning” alone, although it is unique to Motorola, does not qualify Motorola as a sole source under § 41-16-51(a)(ll).
We must also consider whether Motorola is a sole source for the maintenance services in the October 1 contract. In relation to that issue, the trial court held:
“[W]hile under the facts and circumstances of this case the maintenance agreement appears to the Court not to be technically a sole source item, in view of the facts and circumstances that existed at the time and given the rather critical need of the City for maintenance it, likewise, did not need to be competitively bid.”
Although Motorola insists that the October 1 contract was exempt from competitive bidding because of the sole source exception, the trial court did not so hold, at least not expressly. Furthermore, the evidence clearly indicates that not only General Electric through its franchisee Bibbins & Rice, but also other businesses, could have provided the maintenance services provided for in the October 1 contract.
It is not clear on what legal basis the trial court determined that the October 1 contract should not be competitively bid. The trial court seems to have meant to hold that as a matter of equity, even though Motorola was not the sole source, the need for maintenance of the equipment was so critical that competitive bidding was not necessary. Section 41-16-53, Ala.Code 1975, comes the closest of any law that we can find to addressing such a holding:
“In case of emergency affecting public health, safety or convenience, so declared in writing by the awarding authority, setting forth the nature of the danger to public health, safety or convenience involved in delay, contracts may be let to the extent necessary to meet the emergency without public advertisement. Such action and the reasons therefor shall immediately be made public by the awarding authority.”
If the trial court meant to uphold the October 1 contract based on § 41-16-53, it erred in three ways. First, the sheer length of time of the negotiations involved in this transaction plus the length of time over which the supposed “emergency” would have occurred indicates that there was no emergency; the negotiations involved years of work and the “emergency” involved, at worst, a decades-long City-wide atrophy of the equipment, by which the equipment became “gradually obsolete,” in the words of one witness. Second, the City did not comply with the § 41-16-53 requirement of declaring such an emergency in writing, explaining in the writing “the nature of the danger,” and immediately making public the agency’s action and the reasons therefor. Finally, the provision dispenses with the requirement of public advertising, not competitive bidding.
As a final argument, Motorola contends that the contracts should be upheld, because, it says, they were made in “good faith.” In support of that argument, it cites International Telecommunications Systems v. State, 359 So.2d 364 (Ala.1978); White v. McDonald Ford Tractor Co., 287 Ala. 77, 248 So.2d 121 (1971); Carson Cadillac Corp. v. City of Birmingham, 232 Ala. 312, 167 So. 794 (1936). Those cases are inapposite, because they involve fact situations in which there was competitive bidding and the question was whether the bidding authorities had engaged in a good faith exercise of discretion in the process of bidding and awarding contacts.
The trial court erred in determining that the challenged contracts fell within the exception of § 41-16-51(a)(ll) and therefore were not subject to the competitive bidding requirements of § 41-16-50. Before awarding the contracts on the bids involved in this action, the City should have complied with the competitive bidding proce *1317 dures established in § 41-16-51 et seq. The injunctions were due to be granted. The contracts are void, pursuant to Ala. Code 1975, § 41-16-51(d), which provides, “Contracts entered into in violation of this article shall be void....”
The judgment of the trial court is due to be reversed and the cause remanded.
89-590 REVERSED AND REMANDED.
89-1446 REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.

. .Because of our disposition of this case, we do not address whether the lease-purchase agreement violates § 41-16-57(e).