26 A.3d 878

**Jeffery BRESLIN, et al.**

v.

**Ronald L. POWELL, et al.**

**No. 134, Sept. Term, 2010.**

Court of Appeals of Maryland.

Aug. 16, 2011.

Edwin L. Keating, III (E. Philip Franke and Siobhan R. Keenan of Baxter, Baker, Sidle, Conn & Jones, P.A., Baltimore, MD), on brief, for petitioners.

David M. Kopstein (Kopstein & Associates, LLC of Seabrook, MD; Jay D. Miller of Miller, Murtha & Psoras, LLC, Lutherville, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

HARRELL, J.

We wander here once more into the minefield of interpreting the Healthcare Malpractice Claims Act ("HCMCA") and its requirement that a plaintiff in a medical malpractice action file a proper Certificate of Merit ("Certificate").[1] In several

---

1.  Maryland Code (1974, 2006 Repl.Vol., 2010 Supp.), Courts & Judicial Proceedings Article ("CJ"), § 3–2A–04(b) requires a certificate of a

cases considering whether certain Certificates failed to meet the requirements of Maryland Code (1974, 2006 Repl.Vol., 2010 Supp.), Courts & Judicial Proceedings Article ("CJ"), § 3–2A–04, we held that "the language of the [HCMCA] is clear and its meaning unambiguous." *Walzer v. Osborne,* 395 Md. 563, 581, 911 A.2d 427, 437 (2006). We shall stick to our guns in that regard as we consider the requirements of a Certificate in CJ § 3–2A–04, adopted in 1986, in conjunction with the requirements of CJ § 3–2A–02,[2] added in 2004.

Jeffery Breslin, M.D. ("Dr. Breslin" or "Petitioner"), attacks a judgment of the Court of Special Appeals, which reversed the earlier grant of summary judgment by the Circuit Court for Baltimore City in his favor. The intermediate appellate court held that filing a Certificate of an expert that does not meet the requirements of CJ § 3–2A–02 requires dismissal, without prejudice, of the underlying claim, rather than the grant of summary judgment in favor of the defendant. According to the Court of Special Appeals, in the event of failure to meet any of the requirements for the Certificate, regardless of the provision of the HCMCA where the specific requirements appear, therefore, dismissal without prejudice is the appropriate remedy.

Petitioner claims before us that the plain language of CJ § 3–2A–02 allows for summary judgment as proper relief

---

qualified expert to be filed with a medical malpractice claim. Various sources refer interchangeably to the document as a "Certificate of Merit" or a "Certificate of Qualified Expert"; we shall use "Certificate" here for simplicity.

2. The relevant text of CJ § 3–2A–02(c) provides:

1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action. . . .

because CJ § 3–2A–02 does not provide explicitly a remedy for failure to meet its requirements, but states explicitly that the Maryland Rules apply to the HCMCA (Md. Rule 2–501 provides for summary judgment). Accordingly, as the argument goes, because Respondent's attesting expert, Ronald Burt, M.D. ("Dr. Burt"), an anesthesiologist, was not qualified to attest to the standard of care breached allegedly by Dr. Breslin, a vascular surgeon, pursuant to CJ § 3–2A–02, summary judgment was a proper disposition of the case. Finally, Petitioner claims that the Court of Special Appeals's decision is inconsistent with the legislative purpose behind the need for a Certificate, which is to "weed out" frivolous medical malpractice claims.

We hold that, for reasons to be explained more fully *infra*, the plain language of the HCMCA, reading §§ 3–2A–02 and 3–2A–04 together, is clear, and requires dismissal *without* prejudice of the underlying claim for the filing of a non-compliant Certificate, regardless of the particular qualification or requirement the Certificate or its attestor fails to meet. Accordingly, we affirm the judgment of the Court of Special Appeals.

## FACTS AND LEGAL PROCEEDINGS

Jackie D. Powell [3] was admitted to Good Samaritan Hospital on 31 October 2002 for a hepatorenal arterial bypass procedure.[4] Monford Wolf, M.D. ("Dr. Wolf"), a board-certified anesthesiologist, administered epidural anesthesia to Mr. Powell for the procedure while Dr. Breslin, a board-certified

---

3. Jackie D. Powell, the decedent, will be referred to as "Mr. Powell" throughout this opinion. Upon Mr. Powell's death, his son, Ronald L. Powell, filed this suit as personal representative, on behalf of Mr. Powell's estate, and was joined by Mr. Powell's other children. We shall refer to the plaintiffs/respondents of this suit, collectively, but singularly, as "Powell" for simplicity.

4. Prior to the procedure, Mr. Powell was undergoing dialysis due to failing kidneys. The procedure was consented to by Mr. Powell in hopes that the surgery would revitalize one of his kidneys so that he could discontinue dialysis.

vascular surgeon, performed the procedure. Mr. Powell suffered an ischemic spinal cord injury, secondary to an epidural hematoma,[5] as a result of the administration of the epidural anesthesia. Subsequent to the spinal cord injury, Mr. Powell developed paralysis from the waist down, which, according to Powell, caused ultimately Mr. Powell's death on 8 March 2004. Powell claims that Dr. Breslin deviated negligently from the standard of care by failing properly post-operatively to recognize and respond to decedent's complaints of leg pain and numbness. Allegations against various other defendants were based on failing properly to: (1) evaluate pre-operatively the decedent as a candidate for epidural anesthesia; (2) place an epidural needle and catheter in decedent's back; and (3) monitor and document the physiological effects of epidural anesthesia and catheter placement during the peri-operative period.

The present litigation, inspired by the death of Mr. Powell, originated on 30 July 2004 as a Health Claims Arbitration Proceeding pursuant to CJ § 3–2A–03. In conjunction with the claim, Powell filed with the Health Care Alternative Dispute Resolution Office ("HCADRO")[6] a Certificate,[7] and served notice of intent to waive arbitration and transfer the action to the Circuit Court for Baltimore City. The original

---

**5.** An epidural hematoma is defined commonly as "[a] localized accumulation of blood in the space between the dura mater (the outermost covering of the brain) and the inner surface of the cranium (the rounded portion of the skull). It usually occurs in a fracture of the skull, when blood vessels are torn." 2 J.E. SCHMIDT, ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER 105 (1990). In this case, the injury suffered was to the spine (due to compression caused by the hematoma).

**6.** Prior to 11 January 2005, this office was known as the Health Claims Arbitration Office ("HCAO"). *See* CJ § 3–2A–03. We shall refer to the office by its current name, the Health Care Alternative Dispute Resolution Office ("HCADRO").

**7.** The original Certificate of Merit was signed by Dr. Henry Rosenberg, a board-certified anesthesiologist as it turns out. The Certificate, however, does not stipulate Dr. Rosenberg's qualifications or specialties, as required by the HCMCA.

complaint in the Circuit Court, filed in October 2004, named as defendants: Dr. Wolf; his professional association, Hunt Valley Anesthesia Associates, P.A.; and Good Samaritan Hospital of Maryland, Inc. ("Good Samaritan Hospital"). The complaint alleged a survival claim sounding in negligence, as well as a wrongful death claim. Approximately one month later, in November 2004, Powell filed a First Amended Complaint, adding counts against Good Samaritan Hospital.

On 5 August 2005, Powell filed an Amended Statement of Claim with the HCADRO, adding as defendants Dr. Breslin and his professional association. A new Certificate accompanied this filing, which attested to departures from the standard of care by "Jeffery Breslin, M.D., ... Drs. Kremen, Breslin & Fraiman, P.A., and Good Samaritan Hospital, Inc." Attested to by Ronald Burt, M.D. ("Dr. Burt"), a board-certified anesthesiologist, pursuant to CJ § 3–2A–02, the new Certificate stated, "I ... certify that I have had clinical experience, provided consultation relating to the clinical practice, and [/] or taught medicine in the field of Anesthesiology and/or the related field of general surgery, within five (5) years of the date of the ... acts or omissions giving rise to this claim." Powell filed subsequently a notice to waive arbitration and, on 25 August 2005, filed a Second Amended Complaint in the Circuit Court, adding a survival claim sounding in negligence, as well as a wrongful death claim against Dr. Breslin and his professional association.

After several attempts by the defense, beginning in March 2006, to depose Dr. Burt, his deposition was taken on 6 September 2006.[8] At the deposition, Dr. Burt was asked about his qualifications to testify and certify as to the standard

---

8. Delays in depositions of various expert witnesses were caused apparently by scheduling disputes between Powell's counsel and counsel for Good Samaritan Hospital. Adding to the delay, Powell's counsel notified defense counsel in May 2006 that he would be undergoing an unexpected surgery. By 16 August 2005, Good Samaritan Hospital settled with Powell and a stipulation of dismissal was filed as to those claims.

of care for a vascular surgeon. The pertinent portion of the transcript revealed the following exchanges:

[Defense Counsel]: Is it fair to say that you don't hold yourself out as an expert in the field of vascular surgery?

[Dr. Burt]: That's right.

[Defense Counsel]: Do you hold yourself out as an expert in the field of general surgery?

[Dr. Burt]: No.

[Defense Counsel]: Is the only field which you hold yourself out as an expert anesthesiology?

[Dr. Burt]: Exactly.

\*    \*    \*

[Defense Counsel]: With respect to the training that a vascular surgeon may or may not have regarding diagnosing epidural hematomas, would you defer to a vascular surgeon to offer testimony as to what, if any, training a vascular surgeon should have in that issue?

[Dr. Burt]: Yes.

[Defense Counsel]: And with respect to the ability of a vascular surgeon to diagnose an epidural hematoma, based on their training, would you again defer to the expertise of a vascular surgeon on that issue?

[Dr. Burt]: Yes, I would.

In light of the foregoing deposition revelation, Dr. Breslin filed a Motion to Dismiss or, in the Alternative, for Summary Judgment[9] on the grounds that Powell failed to comply with the requirements of CJ § 3–2A–02, mandating generally that any expert who attests in a Certificate to a departure from the standards of care on the part of a health care provider must be board-certified and have clinical, consulting, or teaching experience in the health care provider's specialty.

---

9. Dr. Breslin stated in his Motion to Dismiss or, in the Alternative, for Summary Judgment, that "[w]hen a proper certificate is not filed, it is tantamount to not having filed a certificate at all. When the certificate requirement is not met, the Court is required to dismiss the action." (Citations omitted).

Powell tendered three arguments why the action should not be dismissed, despite Dr. Burt's admission in deposition that he was unqualified to attest to the ability of a vascular surgeon to detect an epidural hematoma and, thus, was not qualified to attest to the standard of care of a vascular surgeon and the alleged breach thereof.[10] First, the action originated in July 2004, one year before the amendment to CJ § 3–2A–02 was enacted that added required qualifications of an expert attesting to the standard of care in a Certificate. *See* CJ § 3–2A–02(c)(2)(i) ("This paragraph applies to a claim or action filed on or after January 1, 2005."). As this argument goes, the substance of the original claim was not changed by adding Dr. Breslin as a defendant; therefore, the more stringent requirements should not apply. The second argument Powell offered was that there is an overlap between the two disciplines—vascular surgery and anesthesiology—that should allow Dr. Burt to attest to and testify regarding the treatment required for an epidural hematoma. To this end, Dr. Breslin's expert witness, Dr. Gary Ruben, testified in deposition (following Dr. Burt's deposition) that vascular surgeons and anesthesiologists alike possess the knowledge and ability to diagnose a spinal hematoma. Moreover, Dr. Ruben, a vascular surgeon, was intended to be offered by the defense at trial as an expert with regard to the standard of care and treatment rendered by both Dr. Breslin and Dr. Wolf. Finally, Powell noted that he had secured a general surgeon who was prepared to testify at deposition and/or trial (and who also signed a Certificate) attesting to the departures from the standard of care by Dr. Breslin.

The Circuit Court, unpersuaded by Powell's arguments, granted summary judgment in favor of Dr. Breslin, explaining that, "[the] legislative directive, coupled with the Court of Appeals' signal that the [L]egislature's directives are to be

---

10. Of particular relevance to the present case, although the new Certificate attested only to departures from the standard of care by Dr. Breslin, his professional association, and Good Samaritan Hospital, the record reflects that Dr. Wolf, the defendant anesthesiologist, remained a party to the case at the time the new Certificate was filed.

strictly applied, convinces this Court that with the passage of the [HCMCA], Dr. Burt is not qualified to attest to the alleged breach of the post-operative standard of care of Dr. Breslin." Powell filed a Motion to Reconsider [11] on the grounds that the appropriate remedy for filing a Certificate that does not meet the applicable standards is dismissal without prejudice, and granting summary judgment "amounts to a dismissal *with prejudice.*" The Circuit Court denied this motion. Powell followed with a Motion to Alter or Amend Judgment Nunc Pro Tunc, which, in essence, raised the same arguments as the reconsideration motion. In denying this motion, the Circuit Court explained that:

> [T]he fact that § 3–2A–04 contains both substantive and procedural requirements does not lead this court to conclude that § 3–2A–04(b)(1)(i), requiring dismissal without prejudice, applies any time a party fails to meet any prescribed procedural or technical requirements for filing a certificate, whether contained in § 3–2A–02 or § 3–2A–04.

> \* \* \*

> A court could dismiss a plaintiff's claim without prejudice for failing to meet the requirements in § 3–2A–02. However, the consequence would be that a plaintiff could continue to come back to the court countless times to try its luck with a different health care provider.... The effect on a defendant, in time and expense, would be unnecessarily burdensome and would defeat the very reason the [L]egislature

---

**11.** Powell, either in the Motion to Reconsider or in subsequent motions and/or appeals, did not allege that Dr. Burt was a qualified expert in the field of vascular surgery, thus meeting the requirements of CJ § 3–2A–02. "The parties agree that, under the provisions of the [HCMCA] ... Dr. Burt, an anesthesiologist, was not a qualified expert to opine upon the standard of care applicable to Dr. Breslin, a vascular surgeon." *Powell v. Breslin*, 195 Md.App. 340, 350–51, 6 A.3d 360, 366 (2010). Therefore, we need not consider, in the present case, whether an anesthesiologist would be unqualified wholly in every case to attest, in a Certificate or in testimony, to the standard of care (and breach thereof) provided by a vascular surgeon.

enacted the statute: to weed out non-meritorious claims and to reduce the costs of litigation.

(Citations, alterations, and quotation marks omitted.)

Powell noted timely an appeal to the Court of Special Appeals. In a reported opinion, *Powell v. Breslin*, 195 Md. App. 340, 6 A.3d 360 (2010), the intermediate appellate court reversed the Circuit Court's judgment, explaining that:

> We see no logic in the suggestion that an expert's failure to satisfy the requirements regarding clinical experience and areas of specialty certification required by CJ § 3–2A–02(c)(2)(ii) should be treated differently than an expert's failure to satisfy the requirement of the 20 percent rule, or the requirement that a certifying expert may not be a party or an employee or partner of a party delineated in CJ § 3–2A–04(b), or, for that matter, any of the requirements as to the form and filing of a certificate. To adopt such an approach would be an endorsement of an interpretation of the statute which imposes inconsistent sanctions for the filing of noncompliant certificates that are deficient based upon the requirements in different sections of the Act. No such dichotomy is expressly included in the language of the Act, and we decline the opportunity to judicially impose such a distinction.

> \*       \*       \*

> In our interpretation of the plain language of the statute, we conclude that the sanction for the failure to submit a fully compliant certificate—whether the failure is in form, content or qualifications of the attesting expert—is dismissal without prejudice. *See* CJ § 3–2A–04(b)(1)(i)(1).

*Powell*, 195 Md.App. at 355, 6 A.3d at 368–69. Dr. Breslin filed a Petition for Writ of Certiorari, which we granted, *Breslin v. Powell*, 418 Md. 190, 13 A.3d 798 (2011), to consider, in our own words: [12]

_____

12. Dr. Breslin posed two questions:
  1. Whether a party should be permitted to undermine legislative intent and arbitrate in bad faith by prosecuting a medical malpractice

Whether, in a medical malpractice case where a party files a certificate signed by an expert who does not meet the qualifications set forth in CJ § 3–2A–02(c)(2)(ii), CJ § 3–2A–04(b)(1)(i)(1) mandates dismissal without prejudice, regardless of whether the case is pending in the HCADRO or the Circuit Court at the time of the revelation?

## STANDARD OF REVIEW

■ This case presents a question of statutory interpretation, and therefore, we review the trial court's disposition through summary judgment under a non-deferential standard of review.[13] *See, e.g., Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2001) ("[W]here the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a [non-deferential] standard of review."). The task of this Court, therefore, is to " 'determine whether the [Circuit Court's decision] was legally correct.' " *See Wash. Suburban Sanitary Comm'n v. Phillips,* 413 Md. 606, 618, 994 A.2d 411, 419 (2010) (quoting *Murphy v. Merzbacher,* 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997)).

---

suit that is founded upon a facially valid certificate signed by an expert who does not satisfy even the broadest qualifications set forth in MD Code Ann., Cts. & Jud. Proc. § 3–2A–02.

2. Whether summary judgment should have been affirmed by the Court of Special Appeals given that the trial court's ruling was founded on the plain language of the statute and the Maryland Rules.

13. Although Dr. Breslin agrees that the appropriate standard of review in the present case is *"de novo,"* he arrives at this destination via an incorrect rhetorical path. In his brief, Dr. Breslin states that "the issue for review before the court is whether the trial court appropriately applied the remedy of summary judgment...." Rather, the issue for review is whether the statute in question contemplates the remedy of summary judgment in the first instance.

## DISCUSSION

### I.  *The Family Tree of the Health Care Malpractice Claims Act*

Over the past four decades, the Maryland marketplace has undergone three major medical liability insurance "crises," each of which engendered legislative responses changing the statutory scheme regulating medical malpractice suits.  *See* Final Report, November 2004 Governor's Task Force on Medical Malpractice and Health Care Access, at 7 [hereinafter TASK FORCE REPORT], *available at* http://images.ibsys.com/2004/1125/3949201.pdf.

### A.  *The First Crisis: 1974–1983*

In 1974, reacting to the upwardly spiraling cost of servicing medical malpractice insurance policies, St. Paul Fire & Marine Insurance Company ("St. Paul") notified the Maryland Medical and Chirugical Faculty ("MedChi"), the leading professional organization of doctors in the State, that St. Paul would not allow doctors to renew insurance coverage plans that expired as of 1 January 1975.  *See* Terry L. Trimble, *The Maryland Survey: 1994–1995: Recent Development: The Maryland General Assembly: Torts*, 55 MD. L.REV. 893, 895 (1996); Kevin G. Quinn, *The Health Care Malpractice Claims Statute: Maryland's Response to the Medical Malpractice Crisis*, 10 U. BALT. L.REV. 74, 77 (1980).  St. Paul, at the time providing medical malpractice insurance to approximately eighty-five percent of physicians based in Maryland, explained its withdrawal as caused by a deficit of nearly ten-million dollars in providing medical malpractice insurance in Maryland at the then-current rates.  *See* Quinn, *supra,* at 77. The company was unable to offset these massive losses, assertedly because the Insurance Commissioner of Maryland had refused its prior requested rate increase.[14]  *See* Trimble, *supra,* at 895; Quinn, *supra,* at 77.

---

14.  St. Paul filed, in September 1973, a request to increase medical malpractice insurance rates by 59.7 percent, which was denied by the

Although the trial court's order mandating that St. Paul renew all applications and outstanding policies at current rates was overturned eventually by this Court, the General Assembly used the time while the litigation was ongoing to respond to the crisis. *See* Trimble, *supra*, at 895. In its 1975 legislative session, the General Assembly created the Medical Mutual Liability Insurance Society of Maryland ("Medical Mutual"), a physician-owned mutual insurance company, in response to St. Paul's threatened exit from the Maryland medical malpractice insurance market. *See* Md.Code (1957, 1972 Repl.Vol., 1977 Cum.Supp.), Art. 48A, §§ 548–56; TASK FORCE REPORT, *supra*, at 7. The creation of Medical Mutual, however, was merely a bridge to greater relief in the 1976 session. In 1976, the General Assembly sought to treat more effectively the malaise that was ailing the medical malpractice insurance market. *See Witte v. Azarian*, 369 Md. 518, 527, 801 A.2d 160, 165 (2002) ("The General Assembly understood that the collapse of the malpractice insurance market was rooted, to some extent in the manner in which malpractice claims arose and were resolved, and ... considered a variety of proposals designed to deal with those underlying issues.").

---

Insurance Commissioner ("the Commissioner"). *See St. Paul Fire & Marine Ins. Co. v. Ins. Comm'r*, 275 Md. 130, 133, 339 A.2d 291, 293 (1975). Following a conference between the Commissioner and St. Paul, in January 1974, a rate increase request of 45.9 percent was approved. *Id.* MedChi, however, rejected the increase and lodged subsequently a complaint with the Commissioner, stating that a new insurance provider should be sought because the rate increases were unacceptable. *See St. Paul*, 275 Md. at 134–35, 339 A.2d at 294. The Commissioner issued an order requiring St. Paul to "accept for renewal at currently applicable rates the physicians' and surgeons' liability insurance (medical malpractice) policy of [the appellees]." *St. Paul*, 275 Md. at 131–32, 339 A.2d at 292 (internal quotation marks omitted). The order further required St. Paul to "continue accepting the business of physicians' and surgeons' liability insurance in the State of Maryland, by receiving *all* new applications ..., and by considering for renewal *all* outstanding policies for such insurance issued by [St. Paul] which have expiration dates on or after January 1, 1975 ...." *Id.* (internal quotation marks omitted). The order of the Commissioner was affirmed by Baltimore City Court. *See id.* Upon St. Paul's appeal to us, the judgment of the lower court was reversed and remanded with instructions to vacate the order. *See St. Paul*, 275 Md. at 144, 339 A.2d at 299.

The General Assembly passed the Health Care Malpractice Claims Act, HCMCA, in 1976 to alter the manner in which malpractice claims were brought and resolved. *See Witte,* 369 Md. at 526, 801 A.2d at 165; *see also* Quinn, *supra,* at 81. The HCMCA modified the existing medium in three main ways: (1) it created the Health Claims Arbitration Office "to facilitate and expedite the resolution of malpractice claims"; (2) it created, through an arbitration panel, an exclusive arbitration procedure for resolving all claims over $5,000; and (3) it provided that the arbitration panel's award would not be binding and all awards could be rejected and recourse had thereafter to traditional judicial actions and remedies. *See* Quinn, *supra,* at 81. Over the next two years, much litigation ensued, challenging the constitutionality of the HCMCA and causing the arbitration scheme not to take effect until 1978, when the Court upheld ultimately as constitutional the HCMCA in *Attorney General v. Johnson,* 282 Md. 274, 313–14, 385 A.2d 57, 80 (1978), *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978).[15] *See Witte,* 369 Md. at 528, 801 A.2d at 166 ("The arbitration scheme was essentially

---

**15.** In *Attorney General v. Johnson,* 282 Md. 274, 385 A.2d 57 (1978), the plaintiffs asserted that the Health Care Malpractice Claims Act, Md. Code (1974, 1977 Cum.Supp.), §§ 3–2A–01—3–2A–09, was unconstitutional. Specifically, the plaintiffs claimed the HCMCA vested impermissibly judicial power in a non-judicial body in violation of the doctrine of separation of powers, abridged access to courts and trial by jury, and denied equal protection of the law to malpractice claimants. *See Johnson,* 282 Md. at 277, 385 A.2d at 59.

The Court of Appeals upheld the constitutionality of the statute in the face of each challenge. First, the Court held that "the statute merely requires that malpractice claims be submitted to nonbinding arbitration before suit may be filed," and neither must the parties accept the award nor can the panel enforce the award. *Johnson,* 282 Md. at 287, 385 A.2d at 65. The panel, therefore, "exercise[s] no portion of the judicial power of this State in the constitutional sense." *Johnson,* 282 Md. at 288, 385 A.2d at 65. As to the second issue, the Court held that the statute did not deprive individuals of either trial by jury or access to the courts because the statute secures trial by jury upon pursuit of a claim in a circuit court. *See Johnson,* 282 Md. at 299–301, 385 A.2d at 72–73. Finally, the Court concluded that "the [HCMCA] bears a fair and substantial relation to its purpose and is thus not in contravention of the fourteenth amendment or our Declaration of Rights." *Johnson,* 282 Md. at 308, 385 A.2d at 77.

placed 'on ice' for about two years while challenges to its legality worked their way through the courts."). Though different aspects of the HCMCA were challenged in several cases in 1980, in both state and federal courts,[16] the arbitration process seemed to staunch the bleeding of the first medical malpractice insurance crisis. *See id.*

B. *The Second Crisis: 1983–late 1990s*

Less than ten years after the first medical malpractice insurance crisis, in 1983, the General Assembly recognized, by adopting Senate Joint Resolution 14, that the State was in the midst of its second malpractice insurance "crisis," as the cost of malpractice insurance had increased ten-fold since the first "crisis." *See Witte,* 369 Md. at 528, 801 A.2d at 166; *see also* S.J. Res. 14, 1983 Md. Laws J. Res. 9. In 1984, Senate Bill 16 presented several recommended changes to tort doctrines and the manner in which malpractice claims were processed. *See Witte,* 369 Md. at 529, 801 A.2d at 167. This Bill, among its proposed changes, included a requirement of a "certificate [of] a 'qualified expert' attesting to a departure from the standards of care or informed consent," to be filed within ninety days of filing the claim, and that the "qualified expert" selected may not receive more than fifty percent of his or her income from testifying in malpractice cases. *Id.* Although the Bill did not pass, its demise spawned, like a mushroom from decay, the creation of a task force whose purpose was to investigate trends in medical malpractice claims. *Id.* In December 1985, the task force reported to the General Assembly that, since

---

**16.** In *Davison v. Sinai Hospital of Baltimore, Inc.,* 462 F.Supp. 778 (D.Md.1978), *aff'd,* 617 F.2d 361 (4th Cir.1980), the federal District Court held that the use of the word "court" in the HCMCA was meant to include federal as well as state courts. Next, in *Bishop v. Holy Cross Hospital of Silver Spring,* 44 Md.App. 688, 410 A.2d 630 (1980), the Court of Special Appeals held that "appropriate damages" included punitive damages and, therefore, claims seeking punitive damages in addition to other damages must submit first to arbitration. For a comprehensive discussion of these cases and other challenges to the original HCMCA, refer to Kevin G. Quinn, *The Health Care Malpractice Claims Statute: Maryland's Response to the Medical Malpractice Crisis,* 10 U. BALT. L. REV. 74, 85–93 (1980).

1984, medical malpractice liability insurance premiums increased, depending on the medical specialty and hospital involved, between thirty and 250 percent. *See Debbas v. Nelson,* 389 Md. 364, 378, 885 A.2d 802, 811 (2005); TASK FORCE REPORT, *supra,* at 7.

In 1986, the General Assembly enacted Senate Bill 559, which made several amendments to the HCMCA in response to the task force report. *See* Ch. 640 of the Acts of 1986; *Witte,* 369 Md. at 531, 801 A.2d at 168. Several provisions aimed to reduce total amounts paid by insurers on claims or judgments—(1) a "cap" was placed on non-economic tort damages at $350,000; (2) a reduction of damages was allowed if the plaintiff received benefits from a collateral source (i.e., health or disability insurance); and (3) the statute of limitations was decreased for a minor to bring a claim.[17] *See* TASK FORCE REPORT, *supra,* at 7; Trimble, *supra,* at 898; *see also* CJ § 3–2A–05(h).

Additionally, Senate Bill 559 amended provisions of the HCMCA relating to the use of experts in medical malpractice cases. As proposed initially in S.B. 16 (1984), the arbitration process was changed to require the filing of a qualified expert certificate and to mandate that such an attesting expert receive no more than fifty percent of his or her income directly from testimony in personal injury cases.[18] *See Witte,*

---

**17.** In 2002, this Court held that the statute of limitations for minors in medical malpractice cases was unconstitutional. *See Piselli v. 75th St. Med.,* 371 Md. 188, 808 A.2d 508 (2002).

**18.** In *Witte v. Azarian,* 369 Md. 518, 530, 801 A.2d 160, 167–68 (2002), this Court detailed the relevant part of Senate Bill 559:

[A] claim filed after July 1, 1986, shall be dismissed if, within 90 days after the date of the complaint, the claimant failed to file with the HCAO a certificate of a "qualified expert" attesting to a *departure* from the standards of care, and that, if the claimant filed such a certificate and the defendant disputed liability, the claim shall be adjudicated in favor of the claimant on the issue of liability unless, within 120 days after the filing of the claimant's expert's certificate,

369 Md. at 530, 801 A.2d at 168; *see also* Bill Analysis of S.B. 559, at 6 (1986). This Bill enacted also a provision incorporating the Maryland Rules of Procedure to "all practice and procedure issues arising under the [HCMCA]," in an attempt to "codify the existing practice regarding the applicability of the Maryland Rules to arbitration proceedings." Committee Report on S.B. 559, at 2 (1986). The originally-proposed S.B. 559 was amended prior to its passage, changing the language "shall be dismissed" to read "shall be dismissed *without prejudice.*" *See* Conference Committee Amendments to S.B. 559, at 2 (1986) (emphasis added). Although we could find no clear legislative history explaining further the origin of this amendment, the amendment clarified any ambiguity regarding whether a claim would be dismissed, with or without prejudice, for failure to file a Certificate.

At common law, prior to the 1986 amendment to the HCMCA, a claimant was not required to file a certificate of a qualified expert and no similarly-stringent qualifications were placed on the testifying expert in medical malpractice actions. *See Walzer,* 395 Md. at 577, 911 A.2d at 435 ("We acknowledge that, at common law, prior to the General Assembly's enactment of the [HCMCA], a claimant was not required to file a certificate of qualified expert in a medical malpractice case."); *Radman v. Harold,* 279 Md. 167, 171, 367 A.2d 472, 475 (1977) ("[W]e have never treated expert medical testimony any dif-

---

the defendant filed a certificate of a "qualified expert" attesting to *compliance* with the standards of care.

*    *    *

The bill, as introduced, copied the Task Force's recommendation that "the attesting expert may not devote annually more than 50 percent of the expert's income from testimony *and other activity related to personal injury claims.*"

(Quoting Final Report, December 1985 Joint Executive/Legislative Task Force on Medical Malpractice Insurance, at 31)(second emphasis added). The fifty percent requirement was struck by the Senate Judicial Proceedings Committee and changed to the current requirement that the attesting expert "may not devote annually more than 20% of the expert's professional activities that *directly involve testimony* in personal injury claims." CJ § 3–2A–04(b)(4) (emphasis added); *see also Witte,* 369 Md. at 530, 801 A.2d at 167–68.

ferently than other types of expert testimony."). In adding such requirements, the certificate requirement is in derogation of the common law,[19] intended to place *additional* requirements on a claimant. *See Carroll v. Konits,* 400 Md. 167, 179, 929 A.2d 19, 26 (2007) ("By enacting the 1986 amendment, the General Assembly determined that . . . in order to maintain an action against a health care provider, a plaintiff is required to file a Certificate and an attesting expert's report *in addition to* filing a complaint."); *Walzer,* 395 Md. at 577, 911 A.2d at 435 ("[T]he statutory language is clear and evidences the Legislature's intent to change the common law."). The purpose of this departure from the common law has been stated several times by our appellate courts as reflecting the General Assembly's desire to "weed out" non-meritorious medical malpractice claims. *See Carroll,* 400 Md. at 207, 929 A.2d at 43 ("The purpose of the statute is to weed out non-meritorious claims."); *Walzer,* 395 Md. at 582, 911 A.2d at 438 ("[T]he General Assembly enacted the [HCMCA] for purposes of weeding out non-meritorious claims and to reduce the costs of litigation."); *Debbas v. Nelson,* 389 Md. at 378, 885 A.2d at 811 ("[T]he requirement of [the Certificate] . . . was intended to eliminate excessive damages and reduce the frequency of claims, and . . . has been considered as serving a gatekeeping function."). Further, in the final report of the Governor's

---

**19.** The Petitioner summarizes accurately the common law procedure for prevailing in a medical malpractice action prior to the 1986 amendment:

[T]o prevail in a medical malpractice action a plaintiff must prove that a physician breached the standard of care in rendering treatment to that plaintiff and caused him injury. "A *prima facie* case of medical negligence must establish (1) the applicable standard of care, (2) that this standard of care has been violated, and (3) that this violation caused the harm complained of." *Karl v. Davis,* 100 Md. App. 42, 51, 639 A.2d 214[, 218] (1994), *citing Weimer v. Hetrick,* 309 Md. 536, 553, 525 A.2d 643[, 651] (1987). The plaintiff must present expert testimony to establish the standard of care and to prove that the defendant breached that standard. *Crockett v. Crothers,* 264 Md. 222, 224–25, 285 A.2d 612[, 614] (1972). For an expert's opinion to be considered, the expert must be qualified to render the opinion . . . [and] the opinion must have a sound basis in both fact and in science.

2004 Task Force on Medical Malpractice and Health Care Access stated in its recommendations that:

This certificate requirement ensures that a health care provider who is not a party has reviewed the claim. It helps ensure that completely spurious claims do not go forward. It also provides a mechanism for the Board of Physicians to receive notice of a claim.

TASK FORCE REPORT, *supra,* at 31.

### C. *The Third Crisis: Early 2000s*

The third medical malpractice insurance "crisis" followed a near twenty-year period of relative stability. Throughout the late 1980s and continuing into the 1990s, the medical malpractice insurance market remained fairly stable. *See* TASK FORCE REPORT, *supra,* at 7. The most relevant change to the HCMCA during this period came during the 1995 legislative session when the General Assembly enacted a bill permitting waiver by either party of the entire arbitration process. *See* Ch. 582 of the Acts of 1995, codified as Md.Code (1974, 2002 Repl.Vol.), CJ § 3–2A–06B; *see also Debbas,* 389 Md. at 380–81, 885 A.2d at 812. This relative stability in the market led to "fiercely competitive pricing on premiums," and "[p]rofitability was made possible by slow claims growth coupled with favorable economic conditions." TASK FORCE REPORT, *supra,* at 7. In 1999, however, medial malpractice premium rates increased dramatically throughout the country. *See id.* Maryland physicians and hospitals felt the effects of these increases in premiums in the early 2000s, with only four insurers providing malpractice insurance to the entirety of the State's physicians and hospitals, after ten insurers abandoned the State beginning in 1995. *See* TASK FORCE REPORT, *supra,* at 7–8.

In 2004, the General Assembly called a special legislative session to address the latest medical malpractice insurance crisis and enacted several changes to the HCMCA. Most relevant to the present case, the 2004 amendments added qualifications for the expert attesting in the Certificate or testifying before the arbitration panel or court regarding the

compliance with, or departure from, the standard of care by the defendant. The amended CJ § 3–2A–02(c)(2)(ii) states:

1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action....

The legislative history illuminating the purpose of this amendment is scant. In his letter vetoing the proposed House Bill 2 of 2004, which was adopted over the veto, then-Governor Robert L. Ehrlich, Jr. stated that the provisions dealing with expert witnesses were intended to "prevent the prevalent use of 'hired gun' experts who do not practice medicine but instead have become experts for hire." Letter from Robert L. Ehrlich, Jr., Governor, to Michael Busch, Speaker of the House of Delegates, at 8 (10 Jan. 2005).

With this "family" history of the HCMCA in mind, we turn to the present case.

## II. *Statutory Construction*

When undertaking an exercise in statutory interpretation, as in the present case, the goal is to "ascertain and effectuate the intent of the Legislature." *Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park,* 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006). In attempting to discern the intent of the Legislature, courts "look first to the plain language of the statute, giving it its natural and ordinary meaning." *State Dep't of Assessments and Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 13, 702 A.2d 690, 696 (1997). If the language of the statute is clear and unambiguous, courts will

give effect to the plain meaning of the statute and no further sleuthing of statutory interpretation is needed. *See Marriott Employees Fed. Credit Union v. MVA,* 346 Md. 437, 445, 697 A.2d 455, 458 (1997) ("When the statutory language is clear, we need not look beyond the statutory language."); *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987) ("Sometimes the language in question will be so clearly consistent with apparent purpose ... that further research will be unnecessary."). If the sense of the statute is either unclear or ambiguous under the plain meaning magnifying glass, courts will look for other clues—e.g., the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute. *See Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998) ("If ... the meaning of the plain language is ambiguous or unclear, we seek to discern legislative intent from surrounding circumstances, such as legislative history, prior case law, and the purposes on which the statutory framework was based.").

It is well-settled that a court must read a statute in the context of its statutory scheme, ensuring that "no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory," and that any illogical or unreasonable interpretation is avoided. *Mayor of Oakland,* 392 Md. at 316, 896 A.2d at 1045; *see also Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 302–03, 783 A.2d 667, 671 (2001) ("[S]tatutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory." (quotation marks and citations omitted)). Additionally, " '[s]tatutes in derogation of the common law are strictly construed, and it is not to be presumed that the [L]egislature by creating statutory assaults intended to make any alteration in the common law other than what has been specified and plainly pronounced.' " *Walzer,* 395 Md. at 573–74, 911 A.2d at 433 (quoting *Gleaton v. State,* 235 Md. 271, 277, 201 A.2d 353, 356 (1964)). With this in mind, courts may consider with caution the cannon of

construction, *expressio unius est exclusio alterius,* meaning "to express or include one thing implies the exclusion of the other, or of the alternative," BLACK'S LAW DICTIONARY 661 (9th ed.2009). *See Kirkwood v. Provident Sav. Bank of Baltimore,* 205 Md. 48, 55, 106 A.2d 103, 107 (1954) ("[This maxim] should be used with caution, and should never be applied to override the manifest intention of the Legislature or a provision of the Constitution."). That that narrow interpretation is applicable to statutes purporting to repeal the common law does not mean that a court will refuse to give effect to a statute abrogating the common law that was intended clearly by the Legislature. *See Witte,* 369 Md. at 533, 801 A.2d at 169 ("Most statutes ... change the common law, so that principle necessarily bends when there is a clear legislative intent to make a change.").

■ Section 3–2A–04(b)(1)(i) provides:

[A] claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint.

Later provisions of CJ § 3–2A–04(b) provide requirements for the Certificate and the "qualified expert" attesting to the Certificate:

(4) A health care provider who attests in a certificate of a qualified expert or who testifies in relation to a proceeding before an arbitration panel or a court concerning compliance with or departure from standards of care may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims.

\* \* \*

(7) For purposes of the certification requirements of this subsection for any claim or action filed on or after July 1, 1989:

(i)  A party may not serve as a party's expert;  and

(ii)  The certificate may not be signed by:

1.  A party;

2.  An employee or partner of a party;  or

3.  An employee or stockholder of any professional corporation of which the party is a stockholder.

As noted above, CJ § 3–2A–04(b)(1)(i) requires that a claimant or plaintiff with a medical malpractice case file a certificate from a qualified expert;  the sanction for failing to file a certificate of a qualified expert is dismissal without prejudice of the "claim or action."   This provision was added to the HCMCA in 1986.   In 2004, the Legislature added additional qualifications for the attesting expert in CJ § 3–2A–02 with the knowledge that the section added in 1986 already required dismissal without prejudice for failure to file a proper Certificate.   *See Bd. of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982) ("The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law.").

The additional qualifications for the Certificate added in 2004 are found in CJ § 3–2A–02(c)(2)(ii), which provides that:

1.   *In addition to any other qualifications,* a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

A.   Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action. . . .

(Emphasis added.)  The use of the words "in addition to any other qualifications" in CJ § 3–2A–02(c)(2)(ii) shows clearly and unambiguously that the Legislature intended the qualifications in CJ § 3–2A–02 and CJ § 3–2A–04 to be read together.   The various qualifications for attesting experts, in both CJ § 3–2A–02 and CJ § 3–2A–04, are all necessary in order to have a proper Certificate.   Therefore, because the two provisions act in tandem, filing a Certificate of an unqualified expert, in contravention of CJ § 3–2A–02, mandates dismissal without prejudice of the claim or action, as provided in CJ § 3–2A–04.[20]

---

**20.**  Although neither Petitioner nor Respondent argue as such, there hangs in the air the question whether CJ § 3–2A–04 is meant to apply only to a defect identified and raised while a claim is still before the arbitration panel and not yet an action before a court.  The title of the section—"Filing a claim;  appointment of arbitrators"—and some of the text, which appears to deal only with claims before the arbitration panel, raise the question *sua sponte*. Other language of the statute, in conjunction with several recent cases, however, suggests that this section is meant to apply to triggering events arising with claims before the arbitration panel as well as actions in the courts.

Section 3–2A–04(b)(1)(i) reads:

Except as provided in item (ii) of this paragraph, a claim *or action* filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant *or plaintiff* fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care. . . .

(Emphasis added.)  The section later states, in subsection (b)(1)(ii), that "[i]n lieu of dismissing the claim *or action*, the panel chairman *or the court* shall grant an extension," if certain conditions are met.  (Emphasis added.)  The parallel use of terms such as "claimant *or plaintiff*," "claim *or action*," and "panel chairman *or the court* " throughout CJ § 3–2A–04 implies that the General Assembly intended this section to address triggering events that come to light in either fora.

Although many of the earlier cases considering the relevant statutory scheme involved issues that arose out of determinations by the arbitration panel, several recent cases, such as *Kearney v. Berger*, 416 Md. 628, 634–35, 7 A.3d 593, 596 (2010), *Carroll v. Konits*, 400 Md. 167, 175–76, 929 A.2d 19, 24 (2007), and *Walzer v. Osborne*, 395 Md. 563, 569, 911 A.2d 427, 430 (2006), have dealt with issues that occurred after the claim was waived into circuit court.  All of these more recent cases involved deficient Certificates and the result of each was dismissal without prejudice.  These cases were decided in this manner because the Certificate is an "indispensable" step in the arbitration process such that arbitration cannot occur without the filing of a proper certificate. *See Carroll*, 400 Md. at 181, 929 A.2d at 28.  Because a claim cannot be in circuit court without meeting all of the requirements for arbitration

Dr. Breslin alleges that the plain language of the HCMCA allows for the grant of summary judgment when an unqualified expert is exposed (after a claim reaches the courts) because CJ § 3–2A–04(b)(2) and CJ § 3–2A–02(d) both refer to the "liability" of the defendant, which, according to Dr. Breslin, "clearly implies summary judgment," while CJ § 3–2A–04(b)(1) makes no mention of liability and mandates dismissal only when no certificate is filed at all.[21]   Section 3–2A–

laid out in CJ § 3–2A–04, including filing a Certificate, filing of a proper certificate is a condition precedent to filing an action in circuit court (or federal district court). *See id.* ("[I]f a proper Certificate has not been filed, the condition precedent to maintain the action has not been met and dismissal is required by the statute once the allotted time has passed."). Therefore, if a proper Certificate has not been filed, the case should not have been in a court in the first place and should be dismissed without prejudice in accordance with the HCMCA.

**21.** Dr. Breslin states baldly in his brief, "[u]se of the word liability clearly implies summary judgment." This leap, however, is made without any support from the statutory language, legislative history, or caselaw relevant to these provisions. He states that CJ § 3–2A–04(b)(1) refers only to dismissal without prejudice when no certificate is filed and does not reference liability, while CJ §§ 3–2A–04(b)(2) and 3–2A–02(c) both refer to liability. This interpretation ignores the fact that dismissal without prejudice does not deem the defendant "liable." Dismissal without prejudice is a "[t]ermination of an action or claim without further hearing," which "does not bar the plaintiff from refiling the lawsuit within the applicable limitations period." BLACK'S LAW DICTIONARY 537 (9th ed.2009).

Furthermore, Dr. Breslin supports his argument that summary judgment is required by noting that CJ § 3–2A–02(d) incorporates the Maryland Rules, which gives the court access to every remedy available under those Rules. *See* Md. Rule 2–501 (summary judgment). As to the statute providing expressly that the Maryland Rules of Procedure apply to issues arising under the HCMCA, the Senate Judicial Committee Report stated that the intent was "to codify the existing practice regarding the applicability of the Maryland Rules to arbitration proceedings." Committee Report on S.B. 559, at 2 (1986).

The legislative history is minimal with regard to this provision. Prior interpretations of this Court have made clear, however, that Dr. Breslin's statement is not supported by the purpose of the provision. In *Newman v. Reilly*, 314 Md. 364, 550 A.2d 959 (1988), we first faced interpreting this incorporation by reference provision. The Court found that "[b]ecause § 3–2A–07(a) more particularly expresses the legislative purpose with respect to sanctions than does the general reference to the rules of procedure in § 3–2A–02(c), the conflict must be resolved in favor of the former, more specific statute." *Newman,* 314

04(b)(1)(i) states that a claim "shall be dismissed, without prejudice, if the claimant or plaintiff *fails to file a certificate of qualified expert* with the Director...." (Emphasis added.) Dr. Breslin posits that the only way possible by which a claimant or plaintiff could "fail to file" a certificate is if the claimant or plaintiff does not file a certificate at all. That is, filing a Certificate signed by an unqualified expert, according to Dr. Breslin, does not constitute a "failure to file," and, therefore, CJ § 3–2A–04, requiring dismissal without prejudice, does not apply and summary judgment becomes a proper remedy. This argument, however, found no favor in several reported cases before Maryland's appellate courts.

In *D'Angelo*, the Court of Special Appeals stated that "failure to file a proper certificate is tantamount to not having filed a certificate at all." 157 Md.App. at 645, 853 A.2d at 822. We adopted this statement in subsequent cases and agree with its continuing correctness. *See Kearney*, 416 Md. 628, 635, 7 A.3d 593, 597 (2010) (quoting favorably the statement in *D'Angelo*); *Walzer*, 395 Md. at 582, 911 A.2d at 438 ("While based on somewhat different facts, we agree with the Court of Special Appeals' general statement in *D'Angelo*."). We imagine several ways in which a plaintiff could "fail to file a certificate of a qualified expert," including but not limited to: (1) not filing a certificate at all; (2) filing a certificate of an unqualified expert who does not have the requisite training; (3) filing a certificate of an otherwise qualified expert who

---

Md. at 379, 550 A.2d at 966. Later, in *Curry v. Hillcrest Clinic, Inc.*, 337 Md. 412, 416, 653 A.2d 934, 936 (1995), we implied that where the statute provides for a specific remedy or action, the Maryland Rules do not apply:

Section 3–2A–02(d) of the Act provides that "except as otherwise provided, the Maryland Rules of Procedure shall apply to all practice and procedure issues arising under this subtitle." The procedure upon default for failure to answer the complaint is not prescribed in the Act or in the rules adopted by the HCAO Director under CJ § 3–2A–03(b)(3). Consequently, Maryland Rule 2–613 governs such defaults.

These cases stand for the proposition that where the HCMCA provides for a specific procedure, that procedure prevails over the more general procedures provided by the Maryland Rules.

devotes more than twenty percent of his professional activities to testimony in personal injury cases; or (4) filing a certificate of a qualified expert that does not include the required report. These and other ways in which a claimant or plaintiff can "fail to file" are not distinguished in the statute. To recognize such a distinction creates a dichotomy that is not included, either expressly or impliedly, in the statute. *See D'Angelo*, 157 Md.App. at 646, 853 A.2d at 822 (dismissing appellant's argument that he was not required to name the defendants in the Certificate and explaining that "[i]f such an interpretation were sanctioned, the certificate requirement would amount to a useless formality"). Stated plainly, a claimant or plaintiff who files a Certificate of an unqualified expert has "failed to file a certificate of a qualified expert."

Dr. Breslin claims further that CJ § 3–2A–02 makes no reference to the dismissal without prejudice provision and, therefore, that provision is not controlling. This argument ignores the plain language of the statute. Section 3–2A–02(c) states "[i]n addition to any other qualifications" and then delineates a list of qualifications; this implies clearly that the Legislature intended CJ § 3–2A–02(c) to work together with other provisions in Subtitle 3–2A that provide additional qualifications for the attesting experts. Moreover, the provision incorporating the Maryland Rules begins, "[e]xcept as otherwise provided," which evinces the Legislature's intent to allow for other sections of the HCMCA to provide practices and procedures specific to medical malpractice claims that would supersede general provisions of the Maryland Rules. *See* CJ § 3–2A–02(d); *see also Curry v. Hillcrest Clinic, Inc.*, 337 Md. 412, 416, 653 A.2d 934, 936 (1995) (stating that where a "procedure ... is not proscribed in the [HCMCA] or in rules adopted by the [HCADRO] Director ... [the] Maryland Rule[s] govern[ ]"). Dr. Breslin focuses on the words *"shall apply to all* practice and procedure issues arising under this subtitle," (emphasis added), ignoring the earlier qualifying language, "[e]xcept as otherwise provided." As the statute provides for a remedy of dismissal without prejudice when a claimant or plaintiff fails to file a proper certificate in CJ § 3–

2A–04(b)(1), that remedy, and not the Maryland Rules, governs the failure to file a certificate meeting the requirements of CJ § 3–2A–02(c).

Throughout his analysis, Dr. Breslin relies heavily on the maxim *expressio unius est exclusio alterius* as his default position. The Circuit Court also relied on this maxim in its grant of summary judgment, stating that CJ § 3–2A–02 allows for summary judgment as it does not refer specifically to whether dismissal should be with or without prejudice. Because, according to the Circuit Court and Dr. Breslin, CJ § 3–2A–04 refers to dismissal without prejudice and CJ § 3–2A–02 does not, *expressio unius est exclusio alterius* implies that dismissal with prejudice, cloaked as summary judgment, is an appropriate remedy. We cautioned, however, that this particular canon of construction should be applied with extreme caution, as

> [it] is not a rule of law, but merely an auxiliary rule of statutory construction applied to assist in determining the intention of the Legislature where such intention is not manifest from the language used. It should be used with caution, and should never be applied to override the manifest intention of the Legislature or a provision of the Constitution. . . .

*Walzer*, 395 Md. at 579, 911 A.2d at 436 (quoting *Hylton v. Mayor and City Council of Baltimore*, 268 Md. 266, 282, 300 A.2d 656, 664 (1972)). Where the plain meaning of the statute is clear, as we believe the provisions relevant to the present case are, the maxim is of no weight. *See Walzer*, 395 Md. at 579, 911 A.2d at 436.

### III. *Legislative Intent*

In rendering the plain meaning of a statute, the legislative intent may be considered. *See State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339, 1341 (1996) ("We may always consider evidence of legislative intent beyond the plain language of the statute."). The to file a proper Certificate. The HCMCA was created "in response to the explosive growth in medical malpractice claims and the resulting effect on health

care providers' ability to obtain malpractice insurance."
*McCready Mem'l Hosp. v. Hauser,* 330 Md. 497, 500, 624 A.2d
1249, 1251 (1992). As a response to such a "crisis," discussed
*supra,* the purpose of the arbitration process, at its inception,
was to screen claims prior to reaching courts, in hopes that
this would decrease litigation costs. *See Carroll,* 400 Md. at
178, 929 A.2d at 26 ("[T]he existing legislative history [makes
clear] that the General Assembly intended the original
[HCMCA] to screen—and to first substitute the arbitration
process as to malpractice claims—prior to the filing of law-
suits.").[22]

As stated by the Maryland Association for Justice, which
filed an Amicus Curiae brief in the present case, another
purpose of the HCMCA is to balance "the preservation of
rights of those injured through malpractice with the rights of
those alleged to have committed the malpractice." By dis-
missing a claim or action without prejudice where the claimant
or plaintiff fails to meet the requirements regarding the
Certificate listed in the HCMCA, either in CJ § 3–2A–02 or

---

**22.** We held previously that "[a] claimant's filing an expert certificate is
an indispensable step in the [HCADRO] arbitration process."
*McCready Mem.'l Hosp. v. Hauser,* 330 Md. 497, 512, 624 A.2d 1249,
1257 (1992). When an incomplete or insufficient Certificate is filed, the
condition precedent to maintain the claim has not been met and,
therefore, dismissal without prejudice is required by the statute once
the allotted time period lapses. *See Carroll,* 400 Md. at 181, 929 A.2d at
28; *see also Kearney,* 416 Md. at 653, 7 A.3d at 607.

   *Carroll* states, "if a proper Certificate has not been filed, the condition
precedent has not been met and dismissal is required by the Statute
once the allotted time period has elapsed," but does not state expressly
that dismissal is with or without prejudice. *Carroll,* 400 Md. at 181,
929 A.2d at 28. Powell explains properly in his brief why the conclu-
sion that dismissal without prejudice is the proper remedy:

    In observing that dismissal is required "by the Statute" where a
    proper certificate has not been filed, this Court [in *Carroll* ] could
    only have been referring to § 3–2A–04(b), which is the only statutory
    provision governing dismissals for failure to file a conforming certifi-
    cate.

This explanation applies equally to the other cases, such as *Kearney,*
where the court failed to distinguish between dismissal with or without
prejudice and stated simply that "dismissal is required" pursuant to the
HCMCA. *See e.g., Kearney,* 416 Md. at 653, 7 A.3d at 607.

CJ § 3-2A-04, the court is balancing these rights by weeding out non-meritorious claims while still allowing the plaintiff, if he or she can, to re-file a claim or action with a proper certificate. Dr. Breslin is correct in stating that a claimant or plaintiff has an affirmative duty to choose a proper expert to attest to the standard of care in the Certificate; however, he states incorrectly that the result sought here by Powell allows a claim or action to go forward even if it lacks merit. Dismissing this case without prejudice would not have allowed the case to go forward with Dr. Burt's Certificate, but rather would have given Powell an opportunity to re-file with a proper Certificate. Although Dr. Breslin claims that this is an unjust result because Powell knew purportedly that Dr. Burt was unqualified before the filing of the Certificate, Dr. Breslin ignores the multiple plausible arguments proposed by Powell in the trial court as to why Powell believed originally Dr. Burt was, in fact, qualified. *See, supra,* at 271-73, 26 A.3d at 881-82.

The requirements added in 2004 to CJ § 3-2A-02(c) emphasize further the importance of a proper Certificate and the Legislature's intent to screen claims, if possible, before they are filed in court. Ch. 5 of the Acts of 2004, 1st Sp. Sess. (stating that the amendment was "[f]or the purpose of requiring that a health care provider who attests in certain certificates or testifies in relation to certain proceedings concerning health care malpractice meet certain qualifications"). As Dr. Breslin states properly, a claimant who retains an unqualified expert does so at his or her peril[23]—the case would be

---

23. Parties to a claim before the HCADRO must make a good faith efforts prior to waiving the claim to court pursuant to CJ § 3-2A-06. *See Karl v. Davis,* 100 Md.App. at 50-51, 639 A.2d at 218 ("To allow less than a legitimate good faith attempt before the [HCADRO] to satisfy the mandatory condition precedent would clearly thwart the [L]egislative intent."). According to Dr. Breslin, Dr. Burt did not meet *any* of the requirements of the statute and the use of him as an attesting expert was an attempt to thwart the objectives of the Legislature and amounts to failure to arbitrate in good faith. Powell, however, in the trial court, provided several plausible explanations for the use of Dr. Burt as the attesting physician in the Certificate. *See, supra,* op. at 272-73, 26 A.3d

dismissed without prejudice. Dr. Breslin, however, states incorrectly that the Legislature intended to provide a stronger remedy for filing a Certificate attested to by an unqualified expert than for failing to file at all.[24] There is simply no

___

at 882–83. Furthermore, the court in *Manzano v. Southern Maryland Hospital, Inc.*, 347 Md. 17, 30–31, 698 A.2d 531, 537 (1997) stated that "[i]n order to dismiss an action for failure to arbitrate in good faith, a circuit court must find that a party exhibited deliberate or willful behavior with the effect of circumventing the Act's mandatory arbitration requirement." Although there is no evidence in the record to support Dr. Breslin's argument, the result would be the same—the case would be dismissed without prejudice.

**24.** As explained *supra,* Dr. Breslin maintains that the Certificate filed by Powell was valid on its face and dismissal without prejudice is the remedy only for a Certificate that is invalid on its face and not when the Certificate is flawed substantively. We agree with the Court of Special Appeals statement that:

> There is no express requirement that the expert's qualifications be stated in the certificate. However, discovery is available so that an opposing party may ascertain the legitimacy of the certificate, and the qualifications of the attestor.

❊   ❊   ❊

> The plain language of CJ § 3–2A–04(b)(3)(ii) provides that "[d]iscovery is available as to the basis of the [Certificate]." This language clearly contemplates that consideration of evidence outside of the pleadings may be necessary to assess the sufficiency of a certificate.

*Powell*, 195 Md.App. at 355, 357, 6 A.3d at 368, 370 (citations omitted).

Dr. Breslin looks to *Debbas v. Nelson*, 389 Md. 364, 885 A.2d 802 (2005) to support his proposition that discovery is not allowed to invalidate an otherwise valid Certificate, and allowing for such would be inconsistent with the plain language of the statute. The facts of *Debbas*, however, are distinguishable from the present case. The Certificate filed by the plaintiff in *Debbas* was valid facially and substantively, and later, at a deposition, the defense discovered that the expert attesting to the standard of care in the Certificate did not intend to testify at trial regarding the standard of care of any of the defendants. *See Debbas*, 389 Md. at 368–69, 885 A.2d at 805–06. This Court held that discovery did not invalidate the Certificate because the revelations arose subsequent to filing of the Certificate. *See Debbas*, 389 Md. at 371, 885 A.2d at 807. In the present case, however, the invalidating circumstances—that Dr. Burt is an unqualified expert in the field of vascular surgery—existed at the time of filing.

Furthermore, Dr. Breslin's argument ignores two cases distinguished by the Court in *Debbas—Witte*, and *D'Angelo v. St. Agnes Healthcare, Inc.*, 157 Md.App. 631, 853 A.2d 813 (2004)—both of which are more similar factually to the present case and allowed discovery revelations to invalidate "facially valid" certificates. In *Witte*, the defendant chal-

indication—in the statutory language, legislative history, or otherwise—that the Legislature intended such a distinction.

Because the Certificate is vital, an action in circuit court (or federal court) will be dismissed without prejudice if *any* of the Certificate's material requirements are not met.[25] In fact, Dr. Breslin conceded this point in the Circuit Court when he urged the trial judge not to reconsider her initial ruling, stating that "[t]he proper remedy for the filing of an incomplete or deficient certificate is dismissal without prejudice."

Dismissing Powell's claim without prejudice does not undermine the legislative intent behind requiring a Certificate and

lenged a Certificate based on deposition testimony that showed the attesting expert did not meet the twenty percent rule. *See Witte*, 369 Md. at 523, 801 A.2d at 163. In *D'Angelo*, the plaintiff filed Certificates that did not name individually the defendant physicians but instead stated that "I have concluded that the foregoing medical providers failed to comply with the standards of care and that such failure was the proximate cause of the injuries to Claimant, Vincent D'Angelo." *See D'Angelo*, 157 Md.App. at 637, 853 A.2d at 817. In both of these cases, a challenge to the Certificate was allowed, pursuant to CJ § 3–2A–04(b)(3)(ii), "because it was based upon a statutory prerequisite for a valid certificate and only examined the circumstances in existence at the time of the Certificate's filing." *Debbas*, 389 Md. at 384, 885 A.2d at 814. Because the issue in the present case is one regarding the statutory prerequisites of the Certificate and circumstances in existence at the time the Certificate was filed (i.e., that Dr. Burt was an anesthesiologist attesting to the standard of care of a vascular surgeon), Dr. Breslin's arrow falls short of the mark.

25. *See e.g., Kearney*, 416 Md. at 668–69, 7 A.3d at 616–17 (holding that dismissal without prejudice is required when a plaintiff fails to meet the requirement of attaching a proper expert report to the Certificate); *Walzer*, 395 Md. at 585, 911 A.2d at 440 (holding that dismissal without prejudice was the appropriate remedy for failure to attach the expert report to the Certificate); *Carroll*, 400 Md. at 201, 929 A.2d at 39–40 (holding that *de facto* dismissal without prejudice was appropriate where a plaintiff's certificate failed to state with specificity that a defendant was the proximate cause of the plaintiff's injury); *Oxtoby v. McGowan*, 294 Md. 83, 91, 447 A.2d 860, 865 (1982) ("So strong is the public policy that this Court will, *sua sponte*, vacate judgment and order an action dismissed where the litigants have not followed the special statutory procedure."); *D'Angelo*, 157 Md.App. at 652, 853 A.2d at 826 (holding that dismissal without prejudice was appropriate where a plaintiff failed to name each of the persons alleged to have violated the appropriate standard of care).

stringent requirements for the attesting expert. Instead, such an outcome supports the legislative purpose by not allowing a claim or action to go forward with an unqualified expert, and, therefore, an insufficient Certificate. Further, dismissing the case without prejudice allows for protection of a plaintiff's rights in a medical malpractice case by providing the opportunity to re-file (assuming the limitations period has not expired) if a qualified expert can attest in a Certificate to departures from the standard of care and causation between such departure and the injury.

Section 3–2A–02(c) and 3–2A–04(b) both provide qualifications for the expert attesting to the Certificate; therefore, the two must be read together, which compels the conclusion that any deficiency in the Certificate requires the arbitration panel or court to dismiss the claim or action without prejudice.[26]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

---

**26.** Powell presents an argument in his brief that, if Dr. Breslin's construction of CJ § 3–2A–02(c)(2)(ii) is correct, then the statute is unconstitutionally vague. In attempting to "ascertain and effectuate the intention of the [L]egislature," it is the policy of this Court to avoid, where possible, reaching a constitutional question. *See Bank of Am. v. Stine,* 379 Md. 76, 85–86, 839 A.2d 727, 732–33 (2003); *see also Auto. Trade Ass'n of Md., Inc. v. Ins. Comm'r,* 292 Md. 15, 21, 437 A.2d 199, 202 (1981) ("It is elementary that appellate courts do not decide issues of constitutionality except as a last resort."). Because we reach the conclusion that Dr. Breslin's construction is incorrect, we will not address Powell's argument regarding the constitutionality of Dr. Breslin's construction.